**IN THE UNITED STATES DISTRICT COURT
NORTHEN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| LOGGERHEAD TOOLS, LLC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 1:12-cv-9033 |
| v. | ) | |
| | ) | Judge: |
| SEARS HOLDINGS CORPORATION, | ) | |
| | ) | JURY TRIAL DEMANDED |
| Defendant. | ) | |
| _____ | ) | |

## COMPLAINT

Plaintiff, LOGGERHEAD TOOLS, LLC, for its Complaint against SEARS

HOLDINGS CORPORATION, alleges as follows:

### THE PARTIES, JURISDICTION AND VENUE

1.      Plaintiff, LoggerHead Tools, LLC ("LoggerHead") is a corporation located

in Palos Park, Illinois.

2.      Defendant, Sears Holdings Corporation ("Sears") is a corporation located

in Hoffman Estates, Illinois.

3.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. §1331

(federal question), §1338(a) (question related to patents) and supplemental jurisdiction

pursuant to 28 U.S.C. §1367.

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. §1391 and

§1400.

1

## FACTUAL BACKGROUND

5.      LoggerHead is the owner of United States Patent No. 6,889,579 (the Bionic Wrench Patent) covering a tool invented by its founder Dan Brown Sr. (Brown Sr.) called the Bionic Wrench.  The Bionic Wrench Patent is attached as Exhibit A.

6.      Brown Sr. has spent his life using tools and has dedicated his career to developing products in various industries.  He is a named inventor on more than 30 U.S. patents.

7.      Brown Sr. is the founder and president of Consul-Tech Concepts, LLC, a product design and development consultancy that develops new products for the marketplace.

8.      Brown Sr. is also a Clinical Associate Professor at the Segal Design Institute at Northwestern University, McCormick School of Engineering, where he teaches several engineering courses, including product design and development.

9.      Brown Sr. spent more than three years designing and developing his new tool, which he calls, and the industry knows as, the "Bionic Wrench."

10.      In January 2004, Brown Sr. applied for the Bionic Wrench Patent, and in 2005 Brown Sr. founded LoggerHead Tools and launched the Bionic Wrench.

11.      The Bionic Wrench is a revolutionary tool that, among other features, adjusts a nut/bolt on its flat sides by squeezing the handles, thereby allowing the user to complete its work without the wrench slipping off and damaging the bolt.

12.      The Bionic Wrench allows the user to use one tool for any size nut/bolt within a certain range, so the user does not have to search for the correct size wrench

2

and whether the nut/bolt is in metric or nonmetric dimensions. Attached as Exhibit B is a LoggerHead brochure depicting one of LoggerHead's Bionic Wrenches.

13.     An important part of LoggerHead's business philosophy is that the Bionic Wrench is manufactured and assembled in the U.S. with all American made components. The Bionic Wrench is manufactured at Penn United Technologies, Inc. ("Penn") located in Pennsylvania.

14.     In order to accomplish this and to compete with the imported hand tools, LoggerHead has had to design and discover a completely new tool that created new value in the marketplace, engineer a design that allowed for an efficient manufacturing process that was both productive and flexible, and develop a low overhead organizational structure and business model.

15.     By the end of 2008, even with the recession, the start-up LoggerHead had sold almost 11 million dollars of Bionic Wrenches at wholesale prices, representing over 20 million dollars in retail sales.

16.     Penn had seven manufacturing/assembly lines for LoggerHead's Bionic Wrench and employed between 20 and 50 workers to manufacture and assemble LoggerHead's Bionic Wrench.

17.     In addition to its own website, LoggerHead has sold its Bionic Wrench to established retailers including Sears, Canadian Tire, QVC, Costco, Amazon, Ace Hardware, True Value, Menards, and others.

18.     The Bionic Wrench has been recognized throughout the world by leading associations for its design and innovative creativity, receiving many significant domestic and international design and innovation awards, including:

3

2009 Popular Mechanics Breakthrough Innovation Award;

2008 iF - International Forum Design Universal Design Award,

2007 Plant Engineering Magazine (Bronze) Product of the Year;

2007 iF International Product of the Year Award;

2007 Farm Industry News FinOvation Award for Product Design;

2006 Chicago Innovation Award;

2006 iF - International Forum Design Product of the Year - Gold Award;

2006 Red Dot Red Dot Product Design Best of the Best Award;

2005 Popular Mechanics Editor's Choice Award;

2005 Chicago Athenaeum Good Design Award.

19.     In comparing the Bionic Wrench to the Apple iPod, the Wall Street Journal has stated "in two of this year's noted international design competitions, only two U.S. companies took home highest honors for their products. One, predictably, was giant Apple Computer Inc. for its sleek, high-tech iPod Nano music player. The other was a tiny unknown Illinois upstart named LoggerHead Tools LLC."

20.     LoggerHead has received a U.S. trademark registration certificate for the name "Bionic Wrench."  (Exhibit C)

**LOGGERHEAD'S RELATIONSHIP WITH SEARS**

21.     With the Bionic Wrench being accepted in the marketplace as a new tool, Sears ordered 15,000 units as a test for the 2009 Christmas season.  Sears sold-out all of these Bionic Wrenches.

22.     In 2010, Sears ordered 75,000 Bionic Wrenches for the Christmas season, and again Sears sold-out.

23.     In 2011, LoggerHead and Sears did a Direct Response TV program ("DRTV") and ordered and received over 300,000 Bionic Wrenches, as LoggerHead committed to Sears that it would not sell to Home Depot or Lowes – Sears' two largest national competitors.  Sears verbally informed LoggerHead's Brown Sr. that the Bionic Wrench was Sears' best-selling and most profitable tool in its category.

24.     In December 2011, Sears' hand-tool buyer, Amanda Campana ("Campana") and LoggerHead's Dan Brown Sr. began discussing a Supply Agreement for 2012 to include Father's Day and Christmas DRTV campaign.  Campana represented that Sears and LoggerHead had developed a strategic partnership, and concurred that if LoggerHead did not sell to Home Depot or Lowes and did not increase the price for 2012, Sears could sell 600,000 Bionic Wrenches with orders starting to be placed in February 2012.

25.     On December 21, 2011, Campana wrote to Brown Sr. inquiring into whether LoggerHead was planning on selling its Bionic Wrench to any of Sears' competitors in 2012:  "We are very excited about the success of the Bionic wrench and we are looking forward to another successful year.   As I am working through my forecast though I wanted to know if there is any chance the Bionic wrench will be in any of our competitors next year. This is something that I will need to factor in if it will be."

26.     Later that day, Brown Sr., believing he and Sears had developed a strategic partnership, responded he would work with Sears and not sell to Sears' direct competitors as long as Sears committed to a sufficient quantity.

27.     In January 2012, Sears reassigned Campana to another tool department and replaced her with Stephanie Kaleta ("Kaleta").  Upon departing, Campana wrote to

LoggerHead "I just want you to know that your partnership with us is VERY important and that is not going to change. The biggest "To Do" right now is the bionic wrench for DRTV. With a new buyer on board, I will be working side by side with her on the launch."

28.     Campana's assistant buyer, Carey Romano, was also reassigned, and she wrote to LoggerHead "Your team has been an integral part of the business for the past two years, and I want to thank you for your partnership. It has been a joy working with you all!"

29.     On January 18, 2012, LoggerHead met with the new buyer Kaleta, at which time she stated she needed a week to get caught up to speed.

30.     On February 8, 2012, Brown Sr. and Kaleta met at Sears. She confirmed a Fathers' Day forecast of 73,000 units at LoggerHead's 2011 price (LoggerHead's price to Sears), and agreed to a Christmas DRTV Program commitment. And in exchange for LoggerHead holding to the 2011 price, LoggerHead would not have to pay Sears for the unpaid 2011 advertising rebates which were coming due. Brown Sr. emphasized that in order for this to work for LoggerHead, it would require a 300,000 unit commitment for 2012. Brown Sr. requested Kaleta put the detailed proposal in writing.

31.     Brown Sr. sent a follow-up email that day, stating that the agreement needed to reflect that Sears would agree to purchase at least 300,000 units in 2012 and to run Father's Day and Christmas DRTV to support the forecasted sales of these units.

32.     Later that day Kaleta sent an email confirming 73,000 Bionic Wrenches for Father's Day DRTV, but failed to confirm the 2012 Christmas DRTV purchase or an annual commitment of 300,000 units, and failed to include a detailed agreement laying

6

out the specifics of her proposal. Kaleta also added another condition about "unit scan" that LoggerHead had never previously discussed, and therefore was not acceptable for LoggerHead.

33.     The following day Brown Sr. sent Kaleta new pricing based upon 300,000 units for 2012, as was discussed with Kaleta at the meeting, and down from 600,000 units discussed with Campana previously. The pricing was at a five percent increase unit price over the 2011 unit price.

34.     Beginning, February 10, 2012, LoggerHead began receiving order transmittals for 73,000 Loggerhead Bionic Wrenches, but at the 2011 prices.

35.     On February 16, 2012, Brown Sr. responded that an order commitment for only 73,000 units would be at a higher price than the 300,000 unit commitment previously agreed to. LoggerHead sent over a second new price schedule based only on the 73,000 unit commitment for 2012 reflecting the new pricing, and informed Sears that without a commitment for all of 2012, LoggerHead would be going to other retailers such as Home Depot and Lowes.

36.     In response to Brown Sr.'s letter, Kaleta, her boss Adam Whitney, and LoggerHead continued negotiations for the 2012 Supply Agreement, which included Christmas forecasts and a Sears DRTV campaign, which is a full length commercial of the Bionic Wrench. However, Whitney and Kaleta wanted to be assured that LoggerHead had not signed an Agreement with any Sears competitors, which Brown, Jr. assured it had not.

37.     On February 24, 2012, Kaleta wrote to LoggerHead confirming the Fathers' Day shipping schedule, and later that week they discussed the artwork for the Fathers' Day displays.

38.     Based on the representation that Sears and LoggerHead were strategic partners and that Sears was negotiating in good faith with the goal to have a 2012 Contract with LoggerHead, LoggerHead did not sell to Home Depot or Lowes.

39.     On March 6, 2012, LoggerHead sent to Kaleta a draft 2012 Supply Agreement requesting a commitment of 300,000 units for all of 2012 with a price increase from 2011 and standard lead times required for LoggerHead for order fulfillment optimization.

40.     The next day, upon receiving requested changes from Kaleta, Brown Jr. sent the First Agreement Revision to the 2012 Supply Agreement with the requested changes which included a forecast of Sears to purchase and receive shipment of a minimum of 300,000 Bionic Wrenches for 2012.

41.     A week later, on March 13, 2012, Brown Jr. inquired into the status of the First Agreement Revision to the 2012 Supply Agreement.  The following day Kaleta responded that she was waiting for the signoff and would advise Brown Jr. "ASAP." Sears, in a separate email discussed the Sears DRTV program for the Bionic Wrench for 2012.

42.     The following week, on March 19, 2012, Brown Jr. again inquired into the status of the 2012 Supply Agreement.  The next day Kaleta had more revisions and on March 23, 2012 Brown Jr. sent Kaleta a Second Agreement Revision to the 2012

Supply Agreement incorporating her requested changes. There were no changes to the price, quantity or lead times.

43.     LoggerHead, based on the strategic partnership and the imminent Sears' signing of the 2012 Supply Agreement, prepared a LoggerHead video display for Sears and demonstrated it to Kaleta.  Kaleta stated she would consider it for the fourth quarter – further providing assurances to Brown Jr. that Sears would submit the 300,000 unit purchase for Christmas.

44.     On March 30, 2012, Kaleta had some minor questions regarding the 2012 Supply Agreement – which Sears had already changed twice.  On April 10th and 18th, Brown Jr. talked to Kaleta and sent her Third Agreement Revision to the 2012 Supply Agreement.  Again, the changes were insignificant and there were no changes to the price, quantity or lead times.

45.     On April 25, 2012, Kaleta informed Brown Jr. that the 2012 Supply Agreement was being reviewed by Sears' "legal team".

46.     On April 27th, 2012, Kaleta told Brown Jr. that she and her and her boss, Adam Whitney, would be at the upcoming National Hardware Show and were planning on meeting Brown Sr. and Brown Jr. at the LoggerHead booth.

47.     On April 27, 2012, prior to the National Hardware Show, Kaleta sent Brown Jr. a Fourth Agreement Revision to the 2012 Supply Agreement.  The Fourth Agreement Revision stated that: (1) except for QVC and Ace Hardware, Sears would have exclusivity to LoggerHead's Bionic Wrench for the period Sears was running the DRTV promotion for Christmas – essentially the entire Christmas season, and (2) significantly shortened the amount of lead time LoggerHead had to deliver the Bionic

9

Wrenches from 90 days to 30 days. These last minute changes were significant and not acceptable, and the parties were to discuss them at the show.

48.     At the National Hardware Show the following week, Whitney did not come. Rather, Craftsman's Product Manager for Hand Tools, Barry Pope, visited the LoggerHead booth with Kaleta and inspected the Bionic Wrench.

49.     On May 15, 2012, Sears' Elliot Lourie, sent LoggerHead Sears' Christmas forecast of 213,519 units to enable LoggerHead to start ordering material to build the Bionic Wrenches.

50.     Sears sold LoggerHead's Bionic Wrenches during Father's Day season and LoggerHead started the process of building the Christmas forecast.

51.     On June 20, 2012, Sears sent to LoggerHead a revised Christmas forecasts of 2,971 units, down from the previous month forecast of 213,519 units.

52.     Thereafter, LoggerHead sent several letters to Kaleta and others in the organization, stating he was blindsided, astonished, and at a complete loss as to why the Christmas forecasts decreased from more than 200,000 units to less than 3,000 units.

53.     On July 17, 2012, Sam Solomon, Senior Vice-President of Sears, President of Tools, acknowledged he was aware that LoggerHead and Sears were working toward a formal agreement and said he would "follow up in the morning and reach out after I build my brain."  Solomon never got back to LoggerHead.

54.     LoggerHead was not aware, nor was it ever told, that over the previous year when Sears was fraudulently negotiating, in what appeared to be "good faith," with

10

LoggerHead--its alleged strategic partner-- Sears was secretly having its own

Craftsman Bionic Wrench manufactured in China.

55.     In September 2012, Sears, through its Craftsman brand, introduced its

"Max Axess Locking Wrench" aka "Craftsman Bionic Wrench" which is a virtual copy of

LoggerHead's Bionic Wrench. (Exhibit  D)

56.     Sears knew for a substantial amount of time that it was not going to

contract with LoggerHead and it was going to manufacture its own product by imitating

LoggerHead's Bionic Wrench.

57.     Sears also knew, through email communications with LoggerHead, the

lead times required to make LoggerHead's business model successful.

58.     Moreover, the process of having Sears manufacture the required special

machines to make all of the components of the Craftsman Bionic Wrench, manufacture

and assemble the components, test the tool through Craftsman testing lab, design the

packaging, and other corporate procedures that must pass through layers of corporate

management in engineering, sales, marketing and finance, and then ship the tools to

the U.S. over the ocean requires a substantial amount of time.

59.     All of the above-mentioned activity was occurring during Sears' alleged

good-faith negotiations with LoggerHead – its "strategic partner"—not selling its Bionic

Wrench to Home Depot or Lowes—Sears' national competitors.

60.      As a direct result of Sears' introduction of the Craftsman Max Axess

Locking Wrench, LoggerHead has lost sales and its manufacturer, Penn, has had to lay-

off approximately 30 employees in Pennsylvania and shut down several of the

manufacturing/assembly lines in its Pennsylvania manufacturing facilities.

11

61.     These injuries were clearly foreseeable to Sears, as it was intimately involved and aware of the process of events which must take place to bring an innovative tool like Bionic Wrench to market.  Sears also knew that by continuing its sham negotiations with LoggerHead, it would prevent any sales to Home Depot and Lowes, due to the necessary lead times for order fulfillment.

62.     Sears used all of Brown Sr.'s years of engineering and marketing investments; and without any investment in engineering or marketing simply went to China, used its cheap labor and introduced the Craftsman Bionic Wrench to replace LoggerHead's Bionic Wrench

63.     In addition, Sears used and continue to use LoggerHead's trademark in interstate commerce.  When performing a "Google", "Bing", or "Yahoo" search using LoggerHead's trademark terms "Bionic Wrench" or "Craftsman Bionic Wrench," ads for Sears appear at the top, touting in bold "Bionic Wrench at Sears" and the user is directed to Sears' websites www.sears.com and www.craftsman.com.

64.     Upon information and belief, Sears purchased LoggerHead's federally registered trademark "Bionic Wrench" and "Craftsman Bionic Wrench" as keywords in the Google AdWords, Yahoo Advertising Solutions and Bing Ads programs so that an internet search for Plaintiff's trademark Bionic Wrench produce Sears advertisement containing "Bionic Wrench" and "Craftsman Bionic Wrench" with links to www.sears.com and www.craftsmen.com.

65.     Defendant's use of 'Bionic Wrench' as keywords and/or meta-tags, trigger commercial advertising for Sears to be displayed at the top of the page as a banner. Because search engines do not specify that these results are not organic or natural

12

results of the user's search terms, it creates the illusion that these are the most relevant search results for the terms entered by the user and allows Sears to reap the goodwill LoggerHead developed in the Bionic Wrench mark.

66. Furthermore, Defendant's use of Plaintiff's mark in connection these ad programs provide the user with direct access (i.e. a link) to Defendant's website to purchase its goods.

67. Sears' willful and infringing use of Plaintiff's trademark causes consumer confusion and is intended to direct users in search of the Bionic Wrench to Sears' website to purchase the Craftsman Bionic Wrench, thereby trading on LoggerHead's goodwill and reputation.

### Count I – Patent Infringement

68. Plaintiff realleges and incorporates paragraphs 1-67 as though set forth fully herein.

69. Sears infringes LoggerHead's Bionic Wrench Patent by making, using, offering to sell and selling its Craftsman Bionic Wrench.

70. Sears' infringement has been willful, as Sears was aware of LoggerHead's Bionic Wrench Patent, but nonetheless decided to infringe it and has continued to infringe it.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) Sears infringes U.S. Patent No. 6,889,579 under 35 U.S.C. §271;

(b) Sears be enjoined from infringing U.S. Patent No. 6,889,579;

(c) Sears' patent infringement has been willful;

13

(d) LoggerHead be awarded damages pursuant to 35 U.S.C. §284;

(e) LoggerHead be awarded prejudgment interest;

(f) LoggerHead be awarded increased damages pursuant to 35 U.S.C. §284;

(g) LoggerHead be awarded its attorney fees pursuant to 35 U.S.C. §285; and

(h) any other relief this Court deems is just and reasonable.

### Count II – Common Law Fraud

71.     Plaintiff realleges and incorporates paragraphs 1- 70 as though set forth fully herein.

72.     Sears knowingly and repeatedly made false statements of material fact to LoggerHead.  Sears knew that these statements caused LoggerHead to believe that Sears was negotiating in good faith and that it intended to enter into a 2012 contract with LoggerHead.

73.     Sears' four revisions to the 2012 Supply Agreement were a stalling tactic for the sole purpose of keeping LoggerHead, its recognized strategic partner, from selling to Home Depot and Lowes in 2012, thereby enabling Sears to capture not only all of those sales, but also to be the "first to market" among them which would give Sears a competitive advantage for the foreseeable future.

74.     Sears' repeated misrepresentations and omissions were part of a deliberate scheme calculated to prevent LoggerHead from selling to Home Depot or Lowes in 2012, thereby allowing Sears to become the market leader.

75.     Sears' scheme included at least the following acts and omissions:

14

a. telling LoggerHead it was negotiating in good faith from December 2011 through June 2012;

b. telling LoggerHead it was a strategic partner and that their relationship would not change;

c. telling LoggerHead that Sears was very excited about LoggerHead's Bionic Wrench and that it "was looking forward to another successful year;"

d. telling LoggerHead that Sears' Campana and Kaleta "would be side by side" for the 2012 launch;

e. telling LoggerHead that LoggerHead would receive the 2012 Christmas order;

f. telling LoggerHead that there would be a Sears DRTV program for LoggerHead's Bionic Wrench throughout 2012, including the Christmas season;

g. telling LoggerHead that Sears' Whitney would be coming to the 2012 National Hardware Show;

h. sending LoggerHead a Christmas forecast of 213,519 units on May 15, 2012;

i. submitting four revisions of the 2012 Supply Agreement during negotiations, with the representation that it intended to sign it;

j. failing to correct LoggerHead's misapprehension regarding Sears' intention to enter a Supply Agreement with LoggerHead and disclosure of its manufacturing its Craftsman Bionic Wrench in China; and

k. at no time before or during negotiations did Sears inform LoggerHead of the material fact that Sears was making its own Craftsman Bionic Wrench in China for introduction in the U.S. for the 2012 Christmas season.

76.    Sears had a duty to make an affirmative statement that it had no intention of purchasing from LoggerHead for 2012 or the Christmas season.

77.    Sears' acts of negotiating and continuously submitting revisions to the Supply Agreement and stating that LoggerHead was its 'strategic partner' contributed to LoggerHead's reasonable belief that Sears was going to purchase from LoggerHead and that it should refrain from selling to Home Depot and Lowes.

78.    There was no reasonable method for LoggerHead to uncover the truth behind Sears' fraudulent scheme and misrepresentations.

79.    LoggerHead's reliance on Sears' misrepresentations caused lost sales to Home Depot and Lowes and it did not make its own DRTV program to further penetrate the market.

80.    LoggerHead justifiably relied to its detriment on Sears' false statements and omissions by not making any sales to Home Depot or Lowes for the 2012 season and not pursuing its own DRTV program for 2012.

81.    LoggerHead's reliance on Sears' false statements was reasonable because Sears continued to negotiate the 2012 sales agreement as evidenced by its numerous revisions to the agreement and continued to confirm its intent to place orders with LoggerHead for both the Christmas season and 2012.  There was no information available to Plaintiff through reasonable means that would have revealed Sears' fraud.

16

82. LoggerHead has been injured by not making sales to Home Depot, Lowes or Sears, and by not making its own DRTV program in 2012. But for Sears' misrepresentations and concealment of its intention to not purchase from LoggerHead and its manufacturing of its Craftsman Bionic Wrench, LoggerHead would not have lost the sales for the Christmas season as well as and other losses listed above.

83. Sears' conduct was egregious and unconscionable because it intentionally made false material statements and omissions which could only result in LoggerHead losing the majority of its sales because it was led to believe that Sears was its strategic partner and that an agreement was imminent.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded damages to the fullest extent permitted by law, including its lost profits;

(b) LoggerHead be awarded Sears' gross profits;

(c) LoggerHead be awarded prejudgment interest;

(d) LoggerHead be awarded punitive damages;

(e) LoggerHead be awarded its costs and attorney fees; and

(f) any other relief this Court deems is just and reasonable.

### Count III – Tortious Interference With Business Relations and Prospective Advantage

84. Plaintiff realleges and incorporates paragraphs 1-83 as though set forth fully herein.

85. Based on LoggerHead's sales of its Bionic Wrench at Sears during test runs in 2009 and 2010, LoggerHead's sales to Sears in 2011, and based upon the

17

statements made by Sears' buyers in 2011 and 2012, LoggerHead had a reasonable expectancy of entering into a contract with Sears for 2012.

86.     Furthermore, because of the continuous negotiations between Sears and LoggerHead in late 2011 and 2012, LoggerHead did not sell its Bionic Wrench to Home Depot or Lowes.

87.     Sears intentionally and unjustifiably interfered and prevented LoggerHead from making sales to Home Depot or Lowes by assuring LoggerHead it was negotiating in good faith and they would have an agreement.

88.     LoggerHead has been damaged as a result of the interference by not selling to Sears for the 2012 Christmas season and not selling to Home Depot or Lowes in 2012 and not making its own DRTV commercial.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded damages to the fullest extent permitted by law, including its lost profits;

(b) LoggerHead be awarded Sears' gross profits;

(c) LoggerHead be awarded prejudgment interest;

(d) LoggerHead be awarded punitive damages;

(e) LoggerHead be awarded its costs and attorney fees;

(f) any other relief this Court deems is just and reasonable.

### Count IV – Trademark Infringement
### (Lanham Act §43(c), 15 U.S.C. §1125(a))

89.     Plaintiff realleges and incorporates paragraphs 1-88 as though set forth fully herein.

18

90.     LoggerHead owns the valid and protectable federally registered trademark "Bionic Wrench."

91.     LoggerHead's certificate of registration is prima facie evidence of the validity, ownership and exclusive right to use the Bionic Wrench trademark.

92.     Bionic Wrench has been continuously used in commerce for the sale and promotion of LoggerHead's wrench since 2005.

93.     Upon information and belief, Sears has infringed LoggerHead's federally registered trademark "Bionic Wrench" by purchasing the keywords and meta-tags "Bionic Wrench" and "Craftsman Bionic Wrench" on various internet advertising solution programs.  For example, when a user searches Google, Bing, or Yahoo with the terms "Bionic Wrench," ads for Sears appear at the top, touting in bold "Bionic Wrench at Sears".

94.     Sears' unauthorized interstate use of LoggerHead's Bionic Wrench mark to sell, offer for sale and/or advertise their goods constitutes a reproduction, copying and colorable imitation of Plaintiff's mark and is likely to cause confusion, mistake, and deception as to the identity and origin of Plaintiff's goods and services that does not exist causing injury, damage and loss to Plaintiff.

95.     A likelihood of confusion is created by Defendants' use of Bionic Wrench in its internet advertising because the public will falsely believe that Craftsman's Bionic Wrench is associated, affiliated, authorized or sponsored by LoggerHead.  This is especially true since Sears sold LoggerHead's Bionic Wrench from 2009-2012 prior to introducing its Craftsman Bionic Wrench later in 2012.

96.     Sears' unlawful use of Bionic Wrench is willful and deliberate and constitutes a knowing violation of LoggerHead's rights.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded its actual damages;

(b) Order Defendants to account for, and turn over to Plaintiff, all money received as a result of its infringement and other unlawful acts;

(c) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using the name and mark "Bionic Wrench" or similar mark in connection with the advertising and/or sale of its products or services;

(d) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using any reproduction, copy or colorable imitation of the name and mark "Bionic Wrench" or any mark confusingly similar thereto in connection with the advertising and/or sale of its products or services;

(e) Order Defendants to, consistent with paragraph (a) above, remove from sale or display any and all labels, signs, prints, signage, internet web pages, advertisements, including keywords or meta-tags utilized in internet advertising programs and any other materials in their possession or control bearing any mark, name or designation identical to or confusingly similar to Plaintiff's Bionic Wrench mark and/or branding;

20

(f) Order Defendants to forfeit and cancel all links and/or web content which utilize 'Bionic Wrench";

(g) Order Defendants to pay Plaintiff's damages totaling three times the amount of compensatory damages as provided for by 15 U.S.C. §1117 and other applicable law;

(h) LoggerHead be awarded reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a);

(i) Order Defendants to pay the costs of this action as provided for by 15 U.S.C. §1117;

(j) LoggerHead be awarded pre-judgment interest on Plaintiff's damages; and

(k) any other relief this Court deems is just and reasonable.

### Count V – False Designation of Origin & Unfair Competition
### (§ 43(a) of the Lanham Act, 15 U.S.C. § 1125 (a))

97. Plaintiff realleges and incorporates paragraphs 1- 96 as though set forth fully herein.

98. Plaintiff has spent substantial time and money to engineer and market its products under the Bionic Wrench mark and developing its reputation and goodwill. Consumers have come to identify the distinctive and protected, Bionic Wrench mark with a high quality, American made, easy to use hand tool.

99. Sears' use of the identical name "Bionic Wrench" in its ads and its purchase of keywords and/or meta-tags to trigger commercial advertising in search engine programs such as Google AdWords, Bing Ads and Yahoo Advertising Solutions, deceive and cause confusion among consumers, as to the source or origin of the goods

21

offered by Defendants and constitutes the use of false descriptions or representations in interstate commerce.

100.    Sears' use of "Bionic Wrench" and "Craftsman Bionic Wrench" is likely to also cause initial interest confusion because Sears' use of Plaintiff's mark on its ads lures consumers to its site and causes the consumer to initially believe that the products or advertisements are associated with Plaintiff.  This constitutes unlawful trading on Plaintiff's goodwill.

101.    As a direct and proximate result of Defendants' unlawful activities, Plaintiff has incurred damages in an amount to be proven at trial, including, among other things, loss of profits, diversion of sales, and diminution in the value of its goodwill associated with the Bionic Wrench mark.

102.    Sears' exploitation of LoggerHead's goodwill and reputation associated with Bionic Wrench is willful and intentional.

103.    Sears actions are in conscious disregard of Plaintiff's rights in the Bionic Wrench trademark and with the intent to trade off LoggerHead's goodwill in its trademark.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded its actual damages;

(b) Order Defendants to account for, and turn over to Plaintiff, all money received as a result of its infringement and other unlawful acts;

(c) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using the name and mark "Bionic

Wrench" or similar mark in connection with the advertising and/or sale of its products or services;

(d) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using any reproduction, copy or colorable imitation of the name and mark "Bionic Wrench" or any mark confusingly similar thereto in connection with the advertising and/or sale of its products or services;

(e) Order Defendants to, consistent with paragraph (a) above, remove from sale or display any and all labels, signs, prints, signage, internet web pages, advertisements, including keywords or meta-tags utilized in internet advertising programs and any other materials in their possession or control bearing any mark, name or designation identical to or confusingly similar to Plaintiff's Bionic Wrench mark and/or branding;

(f) Order Defendants to forfeit and cancel all links and/or web content which utilize 'Bionic Wrench";

(g) Order Defendants to pay Plaintiff damages totaling three times the amount of compensatory damages as provided for by 15 U.S.C. §1117 and other applicable law;

(h) LoggerHead be awarded reasonable attorneys' fees pursuant to 15 U.S.C. §1117(a);

(i) Order Defendants to pay the costs of this action as provided for by 15 U.S.C. §1117;

23

(j) LoggerHead be awarded punitive damages;

(k) LoggerHead be awarded pre-judgment interest on Plaintiff's damages; and

(l) any other relief this Court deems is just and reasonable.

### Count VI – Uniform Deceptive Trade Practices
### Illinois Unfair Competition
### (815 ILCS §510 et seq.)

Plaintiff realleges and incorporates paragraphs 1-103 as though set forth fully herein.

104. Sears' unauthorized, intentional and willful use of Plaintiff's mark Bionic Wrench to promote, advertise, market and/or sell their goods and services in Illinois constitutes unfair competition within the meaning of the Illinois Deceptive Trade Practices Act.

105. Sears' use of "Bionic Wrench" in connection with the sales and promotion of its goods through its advertising online with Google, Yahoo and Bing, and through its purchase and use of Plaintiff's mark in search engine advertising programs constitutes unfair competition and is likely to cause confusion among consumers as to the affiliation, connection, association and/or origin, sponsorship, or approval of Defendants goods by or with Plaintiff in violation of §510 et seq.

106. Notwithstanding Defendants' actual knowledge of Plaintiff's ownership and prior use of the Bionic Wrench mark, Defendants have willfully continued to use Plaintiff's mark in commerce without authorization to promote sale of its goods in violation of §510 et seq.

24

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) Order Defendants to account for, and turn over to Plaintiff, all money received as a result of its infringement and other unlawful acts;

(b) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using the name and mark "Bionic Wrench" or similar mark in connection with the advertising and/or sale of its products or services;

(c) Permanently enjoin Defendants and all others acting in concert or participation with Defendants from using any reproduction, copy or colorable imitation of the name and mark "Bionic Wrench" or any mark confusingly similar thereto in connection with the advertising and/or sale of its products or services;

(d) Order Defendants to, consistent with paragraph (a) above, remove from sale or display any and all labels, signs, prints, signage, internet web pages, advertisements, including keywords or meta-tags utilized in internet advertising programs and any other materials in their possession or control bearing any mark, name or designation identical to or confusingly similar to Plaintiff's Bionic Wrench mark and/or branding;

(e) Order Defendants to forfeit and cancel all links and/or web content which utilize 'Bionic Wrench';

(f) LoggerHead be awarded its costs and attorney's fees; and

(g) any other relief this Court deems is just and reasonable.

## Count VII – Illinois Common Law Trademark Violation

107.    Plaintiff realleges and incorporates paragraphs 1-106 as though set forth fully herein.

108.    LoggerHead has valid and protectable trademark rights in their distinctive and valuable mark, Bionic Wrench.

109.    LoggerHead has and continues to use its mark in the course of commerce and in conjunction with their legitimate business operations since 2004.

110.    Defendants' illegal actions alleged herein create likelihood of confusion or of misunderstanding as to sponsorship, affiliation, connection, association, or certification of the infringing Bionic Wrench.

111.    Defendants have intentionally engaged in conduct that creates a likelihood of confusion in bad faith and in reckless indifference towards the rights of LoggerHead.

112.    LoggerHead has been substantially harmed by Defendants infringement.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded all of Defendants profits from infringement;

(b) LoggerHead be awarded all of its actual damages;

(c) LoggerHead be awarded three times the profits and damages;

(d) LoggerHead be awarded three times its attorney's fees;

(e) LoggerHead be awarded its expenses;

(f)  LoggerHead be awarded pre-judgment interest; and

(g) any other relief this Court deems is just and reasonable.

26

**Count VII – Unjust Enrichment**

113.    Plaintiff realleges and incorporates paragraphs 1-112 as though set forth fully herein.

114.    Sears, through their wrongful conduct has unjustly retained a benefit by making sales of its Craftsman Bionic Wrench.

115.    Sears has retained this benefit to the detriment of LoggerHead which did not sell to Home Depot, Lowes or make its own DRTV commercial because of Sears' conduct and false representations of its strategic partnership with LoggerHead to sell Bionic Wrench.

116.    Sears' retention of the benefit violates the fundamental principles of justice, equity, and good conscience.

WHEREFORE, LoggerHead prays that a judgment be entered in its favor and against Sears as follows:

(a) LoggerHead be awarded all of Defendants profits from infringement;

(b) LoggerHead be awarded all of its actual damages;

(c) LoggerHead be awarded reasonable attorney's fees;

(d) LoggerHead be awarded its expenses and pre-judgment interest; and

(e) any other relief this Court deems is just and reasonable.

Dated:  November 9, 2012                    Respectfully submitted,
                                            LOGGERHEAD TOOLS, LLC

                                             /s/ Lee F. Grossman
                                            Lee F. Grossman
                                            Mark M. Grossman
                                            Tejal P. Fowler
                                            Grossman Law Offices

27

225 W. Washington St.  Suite 2200
Chicago, IL  60602
(312) 621-9000