UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| LOGGERHEAD TOOLS, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | Case No. 12-cv-9033 |
| v. ) | |
| ) | Judge John W. Darrah |
| SEARS HOLDINGS CORPORATION ) | |
| and APEX TOOL GROUP, LLC, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff LoggerHead Tools, LLC ("LoggerHead") filed a Second Amended Complaint ("SAC") against Defendants Sears Holdings Corporation ("Sears") and Apex Tool Group, LLC ("Apex") (collectively, the "Defendants"), alleging, *inter alia*, various patent and trademark violations associated with United States Patents No. 6,889,579 (the "'579 Patent") and No. 7,992,470 (the "'470 Patent"). Defendant Apex has filed a Motion to Exclude the Testimony of Christopher J. Bokhart [267], on the calculation of royalty patent damages and trade dress damages. For the reasons set forth more fully below, Apex's Motion [267] is granted in part and denied in part.

## BACKGROUND

Dan Brown was awarded the '579 Patent in 2005 and the '470 Patent in 2011 and is the founder and President of LoggerHead. (SAC, ¶¶ 10, 11, 13.) Brown founded LoggerHead in 2005 and began selling the Bionic Wrench. (*Id.* at ¶ 17.) In 2009, Sears placed an order for 15,000 Bionic Wrench units for sale over the Christmas season. (*Id.* at ¶ 38.) In 2010, Sears ordered 75,000 Bionic Wrench units. (*Id.* at ¶ 39.) Sears and LoggerHead entered into a one-year supply agreement, which had an effective start date of February 1, 2011, and expired

February 1, 2012. (*Id.* at ¶ 40.) Sears represented that they would purchase more Bionic Wrench units in 2012. (*Id.* at ¶ 47.) In September 2012, Sears announced the "Max Axess Locking Wrench" ("MALW") and began retailing the MALW in their stores. (*Id.* at ¶ 62.) LoggerHead submitted an expert report by Christopher J. Bokhart on the issue of economic damages.

## LEGAL STANDARD

Under the Federal Rule of Evidence 702, trial courts must determine, as a precondition to admissibility, whether expert evidence rests on a reliable foundation and is relevant. *Manpower, Inc. v. Ins. Co. of Pennsylvania*, 732 F.3d 796, 806 (7th Cir. 2013). "Expert testimony is admissible when the testimony is reliable and would assist the trier of fact to understand the evidence or determine a fact at issue in a case." *Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009) (citing Fed. R. Evid. 702; *Daubert v. Merrell Down Pharmaceuticals, Inc.*, 509 U.S. 579, 589-91 (1993)). "The proponent of the expert bears the burden of demonstrating that the expert's testimony would satisfy the *Daubert* standard." *Id.* However, "the rule on expert testimony [is] notably liberal." *Krist v. Eli Lilly & Co.*, 897 F.2d 293, 298 (7th Cir. 1990).

## ANALYSIS

In assessing the admissibility of proposed expert testimony, the focus "must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, 509 U.S. at 595. A court must "make the following inquiries before admitting expert testimony: first, the expert must be qualified as an expert by knowledge, skill, experience, training, or education; second, the proposed expert must assist the trier of fact in determining a relevant fact at issue in the case; third, the expert's testimony must be based on sufficient facts or data and reliable principles and methods; and fourth, the expert must have reliably applied the principles and

methods to the facts of the case." *Lees v. Carthage College*, 714 F.3d 516, 521-22 (7th Cir. 2013). Apex does not challenge Bokhart's knowledge, skill, experience, training, or education or the relevancy of Bokhart's report. Apex does challenge the basis of parts of the report and the reliability. There is no bright-line reliability test, and the reliability inquiry should be "flexible." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 139 (1999). However, there must be "a link between the facts or data the expert has worked with and the conclusion the expert's testimony is intended to support." *United States v. Mamah*, 332 F.3d 475, 478 (7th Cir.2003).

### *Patent Royalty Damages*

Upon a finding of infringement, "the court shall award the claimant damages adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer, together with interest and costs as fixed by the court." 35 U.S.C. § 284. "The patentee bears the burden of proving damages." *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1315 (Fed. Cir. 2011). Bokhart assumed a hypothetical negotiation between the parties. "In litigation, a reasonable royalty is often determined on the basis of a hypothetical negotiation, occurring between the parties at the time that infringement began." *Uniloc*, 632 F.3d at 1312 (citing *Wang Labs. Inc. v. Toshiba Corp.*, 993 F.2d 858, 869-70 (Fed. Cir. 1993)). "Although a reasonable royalty calculation includes some approximation, the Federal Circuit requires sound economic and factual predicates for that analysis." *Sloan Valve Co. v. Zurn Indus., Inc.*, 33 F. Supp. 3d 984, 990 (N.D. Ill. 2014) (internal quotations and citations omitted).

Several factors are relevant when determining a reasonable royalty:

1. The royalties received by the patentee for the licensing of the patent in suit, proving or tending to prove an established royalty.
2. The rates paid by the licensee for the use of other patents comparable to the patent in suit.

3

3. The nature and scope of the license, as exclusive or non-exclusive; or as restricted or non-restricted in terms of territory or with respect to whom the manufactured product may be sold.
4. The licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that monopoly.
5. The commercial relationship between the licensor and licensee, such as, whether they are competitors in the same territory in the same line of business; or whether they are inventor and promoter.
6. The effect of selling the patented specialty in promoting sales of other products of the licensee; that existing value of the invention to the licensor as a generator of sales of his non-patented items; and the extent of such derivative or convoyed sales.
7. The duration of the patent and the term of the license.
8. The established profitability of the product made under the patent; its commercial success; and its current popularity.
9. The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results.
10. The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.
11. The extent to which the infringer has made use of the invention; and any evidence probative of the value of that use.
12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.
13. The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.
14. The opinion testimony of qualified experts.
15. The amount that a licensor (such as the patentee) and a licensee (such as the infringer) would have agreed upon (at the time the infringement began) if both had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee − who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention − would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a prudent patentee who was willing to grant a license.

*Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970), *modified sub nom. Georgia-Pac. Corp. v. U.S. Plywood-Champion Papers, Inc.*, 446 F.2d 295 (2d Cir. 1971). In *Sloan Valve*, this court held that the *Georgia-Pacific* factors apply as to whether any

4

factor supports a higher or lower royalty base, but the factors do not add a specific quantitative figure to the royalty base:

> The Federal Circuit explains that the proper application of the *Georgia-Pacific* methodology is to explain "the effect each factor would have on a negotiated royalty." *Micro Chem., Inc. v. Lextron,* 317 F.3d 1387, 1393 (Fed. Cir. 2003). In *Micro Chem.,* the Federal Circuit upheld the trial court's ruling that the patentee "could not include sales of non-patented items in the royalty base but could demonstrate that those sales were relevant in determining a reasonable royalty," and found that the proper application by the expert was to opine that the factor would "increase" the reasonably royalty. *Id.*; *see also Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co. Ltd.,* No. Civ. A. 88–1814–MA, 1993 WL 1510657 (D. Mass. Apr. 27, 1993) ("Convoyed sales are a factor to be considered in determining a reasonable royalty. They do not create a separate sum on which the royalty is calculated.") (citations omitted). The Committee Comments to the Seventh Circuit's jury instruction on determining a reasonable royalty also indicate that this is the proper application of the *Georgia-Pacific* factors. Comment 2 states, "[t]ypically, patent damages experts will review each of the *Georgia-Pacific* factors and testify as to whether each factor supports a higher royalty rate, a lower rate or is neutral." Seventh Circuit Civil Jury Instruction No. 11.4.4, n. 2.

*Sloan Valve*, 33 F. Supp. 3d at 997-98. Courts have "consistently upheld experts' use of a hypothetical negotiation and *Georgia-Pacific* factors for estimating a reasonable royalty." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 854 (Fed. Cir. 2010).

Bokhart stated that the starting point of negotiations for a per-unit royalty would be between "$2.88 to $11.07 per unit for the 6-inch [wrench] and between "$3.22 to $12.71 per unit for the 8-inch [wrench]." (Bokhart Rpt., pps. 36-37). The lower figures are based on LoggerHead's lost profits on the Bionic Wrench, and the higher figures are based on Defendants' gross profits on the MALW. (*Id.*, pps. 36, 37.) Bokhart then opines that, based on the contested factors, the parties would negotiate to the middle of that range and end at a reasonable royalty of "$5.00 per unit for the 6-inch wrench and $6.00 per unit for the 8-inch wrench." (*Id.*, p. 37.)

Apex argues that Bokhart's royalty damages estimate is overinflated in that Bokhart included improper factors in determining the lowest amount that LoggerHead would have

5

accepted. Specifically, Apex argues that Bokhart made unsupported assumptions that LoggerHead would have sold a Bionic Wrench for every MALW sold[1] and incorrectly included forms of lost profits in his reasonable royalty calculation, such as: lost or diminished profits on other LoggerHead customer sales, price erosion, excess manufacturing costs and "other manufacturing issues," and loss of goodwill.

## Lost Profits

The element of lost profits on other LoggerHead customer sales refers to LoggerHead's inability to sell or expand sales of the Bionic Wrench to other retailers, such as Home Depot and Ace Hardware. For this element, Bokhart relied on the deposition of Dan Brown, the president of LoggerHead, and his testimony that LoggerHead lost out on specific sales to other retailers. Bokhart has examined economic and factual predicates for the element of lost profits. Bokhart admits that the damages for this amount cannot be calculated "to a reasonable probability." (Bokhart Rpt., p. 54.) However, the fact that he cannot calculate the specific amount of lost profits goes to weight, not admissibility. *See Davis v. Duran*, 277 F.R.D. 362, 366 (N.D. Ill. 2011) ("Vigorous cross-examination, presentation of contrary evidence and careful jury instructions, . . . , are the traditional and appropriate means of attacking shaky but admissible evidence."). Further, as discussed below, using price erosion to add a quantitative amount to the reasonable royalty is impermissible. *See Sloan Valve*, 33 F. Supp. 3d at 997-98.

---

[1] This factor is not fully addressed by either party. Regardless, the parties are essentially the only two suppliers of this particular style of wrench. "In the two-supplier market, it is reasonable to assume, provided the patent owner has the manufacturing and marketing capabilities, that it would have made the infringer's sales." *State Indus., Inc. v. Mor-Flo Indus., Inc.*, 883 F.2d 1573, 1578 (Fed. Cir. 1989).

Price Erosion

The element of price erosion refers to LoggerHead's inability to maintain its selling price to existing customers. For this element, Bokhart looked at Sears' average retail selling price for the Bionic Wrench and the MALW and the deposition of Brown. Bokhart admits that he is "unable to calculate the amount of price erosion to a reasonable probability." (Bokhart Rpt., p. 55.) However, in his deposition, Bokhart stated that he could show price erosion but not "the full extent of price erosion." (Dkt. 341-1, 44:3-5.) Bokhart has examined economic and factual predicates for the element of price erosion. Any disputes about his inability to calculate price erosion to a reasonable probability goes to weight and not admissibility. Further, using price erosion to add a quantitative amount to the reasonable royalty is impermissible.

Manufacturing Costs

The element of manufacturing costs refers to cost savings from higher volume production as well as potential lost sales due to manufacturing lag time for large orders. Bokhart admits that he is "unable to calculate the extent of excess manufacturing costs to a reasonable probability." (Bokhart Rpt., p. 56.) There is no basis for his opinion on manufacturing costs in the report. There are no stated economic and factual predicates for the effect that manufacturing costs would have on the reasonable royalty. Bokhart cannot include the "increased manufacturing costs" in his reasonable royalty analysis.

Loss of Goodwill

The element of loss of goodwill refers to intangible damage to LoggerHead's brand, and the positioning of its products as being American, being done by the existence of a cheaper alternative made overseas. Bokhart admits that he is "unable to quantify the extent of damages to a reasonable probability." (Bokhart Rpt., p. 56.) For this element, Bokhart spoke with Brown,

7

who told Bokhart that the brand had been damaged and that LoggerHead had been contacted by upset customers.  In the case of loss of goodwill, there are no stated economic and factual predicates for the effect that loss of goodwill would have on the reasonable royalty.  There is no basis for showing how the alleged loss of goodwill translated into lesser sales or what effect it had on the market.  Bokhart cannot include the "loss of goodwill" in his reasonable royalty analysis.

## Sears as a Party

Apex alleges that it was improper for Bokhart to include Sears as part of the hypothetical negotiation.  Apex also argues that the reasonable royalty should include other retailers to whom Apex sold or offered to sell the MALW.  The reasonable royalty is "determined on the basis of a hypothetical negotiation, occurring *between the parties at the time that infringement began*." *Uniloc*, 632 F.3d at 1312 (emphasis added).  At the time infringement began, Apex was not selling the MALW to other retailers, and those other retailers are not parties to this litigation.  Further, Sears reached out to Apex to develop an alternative to the Bionic Wrench, which resulted in the creation of the MALW.[2]  A negotiation at the time of the creation and sale of the MALW would have included both Sears and Apex.  Further, "parties that make and sell an infringing device are joint tort-feasors with parties that purchase an infringing device for use or resale" and "[e]ach joint tort-feasor is liable for the full amount of damages (up to a full single

---

[2] Apex argues that once damages are paid by an infringer, successive infringement only results in nominal damages.  *See Stickle v. Heublin, Inc.*, 716 F.2d 1550, 1562 (Fed. Cir. 1983).  However, this is applicable to the extent that "[a] purchaser of an infringing device *for which a damages award has been paid* may use it to the extent it could lawfully have done so had the infringing manufacturer originally been licensed to make and sell the product in question." *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 785, 788 (E.D. Va. 1998), aff'd, 185 F.3d 1259 (Fed. Cir. 1999).  In this case, there has been no damages award, and neither of the parties qualifies for nominal damages.

recovery) suffered by the patentee." *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1364 (Fed. Cir. 2001) (internal citations omitted).

Bokhart correctly estimated the reasonable royalty based on a hypothetical negotiation between Plaintiff and Defendants.

*Trade Dress Damages*

Apex also argues that Bokhart should not be allowed to present evidence for trade dress damages. This is moot for two reasons. The first is that summary judgment was granted for Defendants on the trade dress claims. The second is that LoggerHead represents that Bokhart would not present any evidence on this topic. To that extent, Apex's Motion is denied as moot.

## **CONCLUSION**

Apex's Motion to Exclude the Testimony of Christopher J. Bokhart [267] is granted in part and denied in part. Bokhart may not testify as to "increased manufacturing costs" or "loss of goodwill" in his reasonable royalty analysis.

Date:      September 20, 2016            /s/ _____
JOHN W. DARRAH
United States District Court Judge

9