**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LOGGERHEAD TOOLS, LLC, | |
| Plaintiff, | |
| v. | Case No. 1:12-cv-09033 |
| SEARS HOLDINGS CORPORATION and APEX TOOL GROUP, LLC, | Honorable Rebecca R. Pallmeyer |
| Defendants. | |

**LOGGERHEAD TOOLS, LLC'S BRIEF IN SUPPORT OF ITS**
**MOTION FOR ENHANCED DAMAGES**

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................1

II.    ARGUMENT ..................................................................................................2

A.    The Court Should Enter Judgment On The Jury's Verdict Finding Sears' and Apex's Infringement Was Willful ......................................................................2

B.    Sears' And Apex's Willful Infringement Is Egregious Behavior That Warrants The Maximum Enhancement Against Both Sears And Apex ...........................................3

1.    The *Read* Factors Govern Whether To Enhance Damages And The Amount Of Enhanced Damages .........................................................................................3

2.    The *Read* Factors Support Trebling Damages Against Sears And Trebling Damages Against Apex ...............................................................................................4

    a)   Sears' and Apex's Deliberate Copying ..........................................................4
    b)   Sears' And Apex's Failure to Establish a Good Faith Belief of Invalidity or Non-Infringement........10
    c)   Sears' And Apex's Litigation Behavior ..........................................................17
    d)   Sears' and Apex's Size and Financial Condition ................................................19
    e)   Closeness of the Case..............................................................................21
    f)   Sears' and Apex's Duration of Misconduct......................................................22
    g)   The Infringers' Remedial Actions................................................................23
    h)   The Infringers' Motivation for Harm...........................................................24
    i)   The Infringers' Attempt to Conceal Misconduct ...............................................27

C.    The Court Should Award Treble Damages Against Both Sears And Apex...............28

1.    Enhanced Damages Must Be Assessed Separately For Each Willfully Infringing Defendant ....................................................................................................28

2.    The Public Policy Rationale Behind Enhanced Damages Supports Trebling Damages Against Sears And Apex ....................................................................................30

# TABLE OF AUTHORITIES

## CASES

*Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523 (Fed. Cir. 1993) ............................ 10

*Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994) ...................... 4

*Arctic Cat Inc. v. Bombardier Rec. Prods.*, 198 F. Supp. 3d 1343 (S.D. Fla. 2016) ...................... 3

*Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 259 (D. Del. 2012), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013) ....... 23

*Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2014 U.S. Dist. LEXIS 43042 (W.D. Pa. Mar. 31, 2014) ...................................... 28

*Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573 (Fed. Cir. 1983) ...................... 13

*Church & Dwight Co. v. Abbott Labs.*, No. 05-2142, 2008 U.S. Dist. LEXIS 49588 (D.N.J. June 23, 2008) ........... 30

*Datascope Corp. v. SMEC, Inc.*, 879 F.2d 820 (Fed. Cir. 1989) .............................. 16

*Engineered Prods. Co. v. Donaldson Co., Inc.*, 147 F. App'x 979 (Fed. Cir. 2005) ...................... 4

*Fleming v. Escort, Inc.*, No. 1:12-cv-066, 2013 U.S. Dist. Lexis 110203 (D. Idaho Aug. 5, 2013) ........................... 29

*Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 U.S. Dist. LEXIS 78365 (E.D. Tex. June 16, 2016) .................................................... 6

*Halo Elecs., Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923 (2016) ................................ 1, 2, 3, 4

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004) ........................ 5

*Jurgens v. CBK, Ltd.*, 80 F.3d 1566 (Fed. Cir. 1996) .............................................. 3, 4

*Lutron Elecs. Co. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229 (D. Utah 2013) ........................ 5

*Parker-Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07 CV 1374, 2011 U.S. Dist. LEXIS 33578 (N.D. Ohio Mar. 17, 2011) ...................................................... 9

*Polara Eng'g, Inc. v. Campbell Co.*, No. SA CV 13-00007-DFM, 2017 U.S. Dist. LEXIS 27304 (C.D. Cal. Feb. 27, 2017) .......................................................... 2

*Powell v. Home Depot, USA, Inc.*, 715 F.Supp.2d 1285 (S.D. Fla. 2010) ...................... 4

*Read Corp. v. Portec, Inc.*, 970 F.2d 816 (Fed. Cir. 1992) .................................. 3, 4

*Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317 (Fed. Cir. 2004) ................................................. 7

*Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737 (N.D. Ohio 2010) ...................... 7

*Shatterproof Glass Corp. v. Libbey-Owens Ford Co.*, 758 F.2d 613 (Fed. Cir. 1985)) ................................. 2

*State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed. Cir. 1985) ................................. 6

*Syntex (U.S.A.) Inc. v. Paragon Optical, Inc.*, 1987 U.S. Dist. LEXIS 14544 (D. Ariz. Nov. 2, 1987) ...................... 6

*Ven-Tel, Inc. v. Hayes Microcomputer Prods.*, 982 F.2d 1527 (Fed. Cir. 1992) ........................................ 14

*WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) .......................................... 2, 4, 10

*Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10 (Fed. Cir. 2012) ................................. 3

*Wyers v. Master Lock Co.*, 616 F.3d 1231 (Fed. Cir. 2010) ......................................... 5

*Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348 (Fed. Cir. 2008) ............................................ 22

## STATUTES

**35 U.S.C. § 284** ...................................................................................................... 2

# I.   INTRODUCTION

This case is the reason Congress provided for enhanced damages in the Patent Act—and the reason the Supreme Court relaxed the standard for willfulness and enhanced damages in *Halo*. LoggerHead proved that both Sears and Apex knowingly copied LoggerHead's patented Bionic Wrench technology with the intent to steal sales and market share from LoggerHead's award-winning, flagship product. Sears and Apex continued to knowingly infringe for the nearly five years that have elapsed since LoggerHead filed this lawsuit—including the years since the Court's Markman Order foreclosed any conceivable defense to Defendants' infringement. The jury concluded that both Sears and Apex are willful infringers. Sears all but defaulted on presenting a defense to willful infringement. And internal Apex documents revealed that its so-called advice of counsel defense was nothing more than a (woefully inadequate) insurance policy against the very enhanced damages LoggerHead seeks in this Motion.

The issue before the Court is how much to enhance the jury's damages award. The egregiousness of Sears' and Apex's misconduct warrants the maximum enhancement against each Defendant. Sears' and Apex's strategy of efficient infringement was based on their belief that it would be more profitable for a couple of billion-dollar companies to team up and to grab "every dollar of margin" by stealing the innovative technology of a small, father-son company than to do the hard work of creating their own new tool. Not content with merely knocking-off LoggerHead's Bionic Wrench, neither Sears nor Apex could even muster the creativity on one of their "innovation calls" to come up with their own marketing strategy—they ripped that off too— shamelessly peddling Dan Brown's invention story as their own. And although even the maximum enhancement cannot inflict the penalty Sears and Apex deserve, it should be assessed to reflect the judiciary's intolerance for the Defendants' wanton piracy, and to send a message to Sears, Apex, and any others who may one day consider setting out to destroy a family-owned business out of

pure greed. Sears and Apex apparently thought it could use its massive advantage in resources to overwhelm LoggerHead—and even if they ultimately lost, pay the same reasonable royalty it could have negotiated in an honest business transaction. Enhanced damages exist to address, deter, and penalize this exact behavior.

## II.    ARGUMENT

Upon a finding of willful infringement, the Court may award "damages up to three times the amount found or assessed." 35 U.S.C. § 284. Under *Halo*, the Court has "greater discretion in awarding enhanced damages in cases where the defendant's infringement was egregious, cases 'typified by willful misconduct.'" *WesternGeco L.L.C. v. ION Geophysical Corp.*, 837 F.3d 1358, 1364 (quoting *Halo Elecs., Inc. v. Pulse Electronics, Inc.*, 136 S. Ct. 1923, 1934 (2016)). LoggerHead established at trial that both Sears and Apex engaged in willful misconduct, and treble damages against both Sears and Apex are warranted here.

### A.   The Court Should Enter Judgment On The Jury's Verdict Finding Sears' and Apex's Infringement Was Willful

The jury found both Sears and Apex to be willful infringers. "Willfulness of behavior is a classical jury question of intent. When trial is had to a jury, the issue should be decided by the jury." *WBIP, LLC v. Kohler Co*., 829 F.3d 1317, 1341 (Fed. Cir. 2016). Because questions of credibility and motivation relating to willfulness are within the province of the trier of fact (*see Shatterproof Glass Corp. v. Libbey-Owens Ford Co*., 758 F.2d 613, 628 (Fed. Cir. 1985)), the Court must enter judgment on the verdict unless "the evidence, construed in the light most favorable to [plaintiff], permits only a conclusion contrary to the jury's verdict." *Polara Eng'g, Inc. v. Campbell Co.*, No. SA CV 13-00007-DFM, 2017 U.S. Dist. LEXIS 27304, at *43-44 (C.D. Cal. Feb. 27, 2017) (citing *WBIP*, 829 F.3d at 1341). The jury was presented with more than sufficient evidence to support is finding of willfulness. *See infra*, § II.B.4.

**B. Sears' And Apex's Willful Infringement Is Egregious Behavior That Warrants The Maximum Enhancement Against Both Sears And Apex**

"Once willful infringement is found, the question of enhancement is firmly committed to the sound discretion of the district court. *See Halo*, 136 S. Ct. at 1931; *see also Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1570 (Fed. Cir. 1996) (once the fact-finder determines that an infringer is "guilty of conduct upon which increased damages may be based[,] … the court then determines, exercising its sound discretion, whether, and to what extent, to increase the damages award given the totality of the circumstances"). . . Enhancement of damages often follows a finding of willful infringement. In fact, the Federal Circuit has instructed that, upon such a finding, "courts should provide reasons for *not* increasing a damages award" under § 284. *Jurgens*, 80 F.3d at 1572 (holding that, in light of the jury's findings of willful infringement, trial court abused its discretion in refusing to enhance damages without an explanation of any proper mitigating factors)." *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 198 F. Supp. 3d 1343, 1348-50 (S.D. Fla. 2016). "An act of willful infringement satisfies th[e] culpability requirement and is, without doubt, sufficient to meet the first requirement to increase a compensatory damages award." *Whitserve, LLC v. Comput. Packages, Inc.*, 694 F.3d 10, 37 (Fed. Cir. 2012) (reversing denial of enhanced damages).

**1. The *Read* Factors Govern Whether To Enhance Damages And The Amount Of Enhanced Damages**

Upon a jury's finding of willful infringement, district courts have discretion "to take into account the particular circumstances of each case in deciding whether to award [enhanced] damages, and in what amount." *Halo*, 136 S. Ct. at 1933. The Federal Circuit has identified a nonexclusive list of factors that "assist the trial court in evaluating the degree of the infringer's culpability and in determining whether to exercise its discretion to award enhanced damages and how much the damages should be increased." *Read Corp. v. Portec, Inc.*, 970 F.2d 816, 827-28 (Fed. Cir. 1992). These factors include: (1) whether the infringers deliberately copied the ideas or

design of another; (2) whether the infringers, when they knew of the plaintiff's patent protection, investigated the scope of the patent and formed a good-faith belief that it was invalid or that it was not infringed; (3) the infringers' behavior as a party to the litigation; (4) the infringers' size and financial condition; (5) the closeness of the case; (6) the duration of the infringers' misconduct; (7) remedial action by the infringers; (8) the infringers' motivation for harm; and (9) whether the infringers attempted to conceal their misconduct. *Id*. The Federal Circuit recently confirmed that district courts may still rely on the *Read* factors to guide their discretion. *Kohler*, 829 F.3d at 1325 (affirming enhanced damages based on the *Read* factors).

The *Read* factors strongly favor trebling damages against Sears and Apex, both to punish Sears' and Apex's misconduct and to deter them and others from similarly egregious infringement. *Read*, 970 F.2d at 827. This case is a textbook example of the need to treble damages against each defendant to punish and deter willful infringement. *Halo*, 136 S. Ct. at 1931.

      **2.    The *Read* Factors Support Trebling Damages Against Sears And Trebling Damages Against Apex**

      **a)  Sears' and Apex's Deliberate Copying**

There is a reason the first *Read* factor is copying—it is a critical factor in deciding whether enhanced damages are warranted. *See Amsted Indus., Inc. v. Buckeye Steel Castings Co.*, 24 F.3d 178 (Fed. Cir. 1994) (affirming award of treble damages in view of infringer's copying and jury's willfulness finding); *Engineered Prods. Co. v. Donaldson Co., Inc.*, 147 F. App'x 979, 991-92 (Fed. Cir. 2005) (affirming award of treble damages where infringer engaged in "deliberate copying"); *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1569–73 (Fed. Cir. 1996) (requiring the district court to reconsider decision not to enhance damages when infringer copied the claimed invention); *Powell v. Home Depot, USA, Inc.*, 715 F.Supp.2d 1285, 1296 (S.D. Fla. 2010) (awarding treble damages where infringer "deliberately and callously" copied the claimed invention).

"Federal Circuit case law holds that copying requires evidence of efforts to replicate a specific product." *Lutron Elecs. Co. v. Crestron Elecs., Inc.*, 970 F. Supp. 2d 1229, 1242 (D. Utah 2013) (citing *Wyers v. Master Lock Co.*, 616 F.3d 1231, 1246 (Fed. Cir. 2010). Copying "may be demonstrated either through internal documents, direct evidence such as disassembling a patented prototype, photographing its features, and using the photograph as a blueprint to build a virtually identical replica, or access to, and substantial similarity to, the patented product." *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004). The evidence at trial established that both Sears and Apex copied the Bionic Wrench.

Both Defendants' intent to copy the Bionic Wrench was clear from the beginning—their goal was to create a "Craftsman version of the Bionic" Wrench.[1] Recognizing that "there was a demand" for the Bionic Wrench, in February of 2012, Sears' Buyer Stephanie Kaleta approached Barry Pope (Sears Craftsman) about an "opportunity" to use LoggerHead's Bionic Wrench "as a basis" to develop a wrench that "could win some business from" the Bionic Wrench.[2] On February 21, 2012, Mr. Pope directed Apex to design and manufacture the "Bionic 2.0 Wrench" which was later named the Max Axess Locking Wrench ("MALW"). (Pope Tr. 43:9-43:11, 71:21-72:3; Tr. 943:2-4.) In particular, Mr. Pope communicated to Apex that one requirement for the "Bionic 2.0" was that "at Craftsman, [the wrench] can't be worse than the competition that you're going after." In short, the Bionic 2.0 had to be "equal to or better" than the Bionic Wrench, and it could be better simply by "add[ing] extra features." (Pope Tr. 86:17-24.) To accomplish this, Sears expected that Apex would use the Bionic Wrench as a benchmark. (Arvia Tr. 146:13-24.) By

---

[1] PTX 476 (Sears email referencing "Craftsman version of the Bionic"); Arvia (Sears) Tr. 276:18-277:2; Whitney Tr. 198:14-16, 213:15-17; PTX 495 (Apex email to Sears re: "Bionic replacement"); Tr. 976:10-20 ("the Max Axess was indeed a Bionic replacement"); Li Tr. 70:18-71:20, 71:23-25 ("this bionic replacement means Craftsman version with Craftsman advantage as a competitive product" to the "LoggerHead Bionic Wrench").
[2] Pope Tr. 43:5-43:8, 46:24-47:4, 94:5-95:11 ("one of the key things that you do in any product development is benchmarking. … [P]art of the benchmarking is looking at competitive tools."), Arvia Tr. 147:16-18, 147:21-24.

directing Apex to use the Bionic Wrench as a template for the MALW in order to take away sales from the Bionic Wrench, Sears itself engaged in copying. *Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 U.S. Dist. LEXIS 78365, at *54-56 (E.D. Tex. June 16, 2016); *State Industries, Inc. v. A.O. Smith Corp.*, 751 F.2d 1226 (Fed. Cir. 1985) ("slavish copying" occurs when the infringing product is virtually an exact copy of the patentee's product or is made using the patentee's product as a template); *see Syntex (U.S.A.) Inc. v. Paragon Optical, Inc.*, 1987 U.S. Dist. LEXIS 14544, at *106 (D. Ariz. Nov. 2, 1987) (finding willful infringement and enhancing damages against both defendants who "were and are mere imitators who sat on the sidelines until [Plaintiff] took all the risks and bore all the financial burdens to make [the patented product] a success. They then copied the inventions, touted their products as replacements for [the patented product], and did everything possible, whether legal or not, to take away sales from [Plaintiff].").

As Sears requested, Apex copied the Bionic Wrench when designing the MALW. Apex admits that in developing the MALW, "one of the first things [Apex] did was to familiarize itself "with the features and benefits of the Bionic Wrench," which they had at their facility. (Tr. 944:16-20.) Apex also admits that they "pa[id] close attention to the [ B]ionic" when designing the MALW—and ordered that the MALW "design should be the same or even better than the [B]ionic" because "Sears will likely compare them." (PTX 125; Li Tr. 96:18-97:4.)

But Apex did more than this. To ensure that their design was the same as the Bionic Wrench, Apex designed the MALW by reverse engineering the Bionic Wrench—meaning that they "took it apart and thoroughly analyzed it to understand the details of how it works." (Tr. 945:12-23; PTX 169 (email subject: "reverse engineer the bionic wrench")) In fact, Apex admitted that "as part of the design process in developing this Max Axess Locking Wrench," they photographed the Bionic Wrench, "tested the Bionic Wrench a lot" and "reverse engineer[ing] the

Bionic Wrench … was one of the first steps" in developing the MALW.[3] And Apex's copying of the Bionic Wrench was not limited to the start of development. Rather, "[i]t was not uncommon for Apex internal communications to reference the Max Axess as the Bionic 2 or some derivation of the Bionic Wrench" because Apex was "referencing the competitive product the whole time." (Tr. 965:13-17.) Apex's actions, including "disassembling a patented prototype, photographing its features, … access to, and substantial similarly to, the patented product" are exactly what the Federal Circuit finds to be copying. *Iron Grip Barbell Co. v. USA Sports, Inc.*, 392 F.3d 1317, 1325 (Fed. Cir. 2004).

In addition to using the Bionic Wrench as a template for the MALW, which itself constitutes copying, Apex's internal documents reveal that they took special effort to copy certain features of the Bionic Wrench. For example, Apex "measured the size of nuts and bolts that the Bionic Wrench could handle," identified the overlap of fasteners that both the 6-inch and the 8-inch can work on," and copied these exact specifications for both the 6-inch and 8-inch MALW. (Tr. 961:7-17, 962:21-963:4, 976:21-978:6.) In fact, Defendants blindly copied the overlap of fasteners between the 6-inch and 8-inch Bionic Wrenches even though "it was not logical to [them] why a tool designer would be so concerned about the overlap." (Tr. 976:21-978:6.) Apex's efforts to make the Max Axess as similar as possible to the Bionic Wrench support a finding of copying. *See Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 749 (N.D. Ohio 2010) (the "evidence at trial clearly supports a finding that [Defendant] deliberately copied" Plaintiff's products where Defendant made "the replacement [product] as

---

[3] Tr. 921:1-9, 921:19-22, 944:2-8, 958:12-15, 960:21-25, 969:12-22, 970:10-21, 971:13-972:15; PTX 136 (Apex email attaching photographs of the Bionic Wrench along with a testing report); PTX 64 (testing report Apex ran on the Bionic Wrench); PTX 83 (Apex email stating "Attached is user generated torque data on the 6" and 8" Bionic Wrench (current Loggerhead design without locking mechanism")); PTX 105 (Apex email stating "Attached file is the testing report for 6in and 8in Bionic Wrench"); Li Tr. 31:17-24, 32:10-16, 32:21-33:6, 35:25-36:3, 58:2-20, 59:8-15, 188:21-189:7, 189:16-190:19, 191:5-191:7 ("we did have a product looking at – that was the LoggerHead's Bionic wrench we were looking at and we – to understand how the – the LoggerHead wrench works, yes.").

similar as possible" to the patented product, the infringing product had some of the same features as the patented product, and an expert testified that the products "worked exactly the same.").

Apex even described the benefits of the MALW the same way LoggerHead described the Bionic Wrench. Specifically, Apex described the MALW as having the "flexibility and strength of an adjustable wrench with the adjustment speed of a gripping plier," in comparison to the Bionic Wrench, which had been described as "[d]esigned to combine the efficiency of an adjustable wrench with the simplicity of a pair of pliers."[4] Apex's copying of LoggerHead's idea for the Bionic Wrench weighs in favor of enhancement. *See Stryker Corp. v. Intermedics Orthopedics, Inc.*, 96 F.3d 1409, 1414 (Fed. Cir. 1996) ("the inquiry is whether the infringer intentionally copied the ideas of another, or deliberately copied the ideas or design of another.").

Throughout the MALW development process, as Apex worked to "capture[] that market opportunity" Sears had identified from the Bionic Wrench, there was "a feedback loop from Sears." (Arvia Tr. 144:3-144:14.) As part of this feedback, Sears complained to Apex that the MALW "handles are too far apart." (PTX 125.) Apex "measured the dimensions of the Bionic Wrench components" and "referenced the Bionic Wrench's dimensions when it was designing the Max Axess," and discovered that "[t]he handles on the loggerhead tools are about .25 to .50 inches closer together." (Tr. 959:16-960:13; PTX 125.) As a result, Apex directed its engineers to "review if there is a way to make the handles of our design closer together … [but] keep the same fastener fitment ranges (we do not want to loose [sic] a size of fastner [sic])."). Apex then reported to Sears that they had reduced the MALW handle width to be "120mm," which was "very good

---

[4] PTX 287; Tr. 289:16-291:4; PTX 371.2; Tr. 296:19-298:10 ("pliers-like gripping but the adjustability – very simple adjustability to engage the fastener" "adjustability that allows you to go to any size … nut or bolt, finds the flats and it's gripping and catching all the flats at the same time" for "a perfect wrench") 845:19-846:1; Li Tr. 31:17-24, 32:10-16, 32:21-33:6.

news" because it "is the same handle width as the Logger[H]ead 8"."[5] Sears responded, "Thanks so much to you and your team for executing this change!" (Tr. 856:21-857:20; PTX 129 at 1.) Apex's deliberate copying of these Bionic Wrench features at Sears's direction, along with the other facts and circumstances described, creates a reasonable inference that Apex and Sears copied the Bionic Wrench. *See Parker-Hannifin Corp. v. Wix Filtration Corp.*, No. 1:07 CV 1374, 2011 U.S. Dist. LEXIS 33578, at *29-30 (N.D. Ohio Mar. 17, 2011) (finding a reasonable inference of copying where Defendants were aware of the infringed patent, began creating their product to "take [] business away" from Defendant, and "copied the size and geometry" of the patented product, despite Defendants' arguments "that these elements are not covered in the patent and that they made several changes to the [product] in an effort to design around the patent.").

That Apex—at Sears's direction—copied the Bionic Wrench is most evident through the MALW development timeline. Mr. Brown testified that it took him over three years to develop the Bionic Wrench. (Tr. 305:7-14.) And Apex admitted that even though they primarily work on "old products that have been around for a long time," "the standard practice for a timeline for new product development … within Apex was a minimum of 8 to 12 months, [and] 12 to 18 months would be more standard." (Tr. 905:25-906:13, 941:17-21.) Yet despite only receiving the development request from Sears on February 21, 2012, Apex developed an initial design in less than a week, delivered a prototype of the MALW to Sears less than two months later—on April 17, and had completed its design in three months—by May 22.[6] Apex developed the MALW in less than half its minimum time required for new product development; the most reasonable inference is that Apex was able to do so because it did not develop a new product—it merely

---

[5] PTX 121 at 3; PTX 346 at 3; PTX 373 at 1; PTX 352; Tr. 852:5-853:12, 856:21-857:20; Lowe Tr. 133:7-14; Li Tr. 87:18-88:6; Arvia Tr. 164:7-14, 164:19-165:2; Pope Tr. 85:20-85:24, 86:4-86:9, 86:11-86:15, 86:17-24.
[6] Tr. 941:17-21, 943:2-4, 839:18-840:7; PTX 119 (2/22/12 Email re: "opportunity on 'Bionic 2.0'"); Lowe Tr. 29:16-25, 30:13-31:1, 31:11-16; PTX 461 (4/17/12 Email "Fyi i [sic] have the prototype of the craftsman bionic wrench to show you."); PTX 501; PTX 360; DTX 157 (Apex initial design); PTX 164 (final drawings); Whitney Tr. 198:17-19.

copied the Bionic Wrench. This inference supports a finding of copying and enhanced damages.

*See WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1336-37 (Fed. Cir. 2016) (upholding finding that Defendant "copied the claimed invention" based on evidence that Defendant's "engineers were aware of and had access to [the patented product] and shortly thereafter with express reference to the [patented product] adopted the same features in developing [the infringing product].").

Finally, Sears and Apex even copied the Bionic Wrench packaging:

> The goal is to have the [MALW] artwork have more 'sizzle' similar to the Bionic Wrench artwork (see attached). … I would like your team to work on the following: 1. Adding a try me arrow to the front of the package 2. Including a graphic on the back that can convey the information below. I am thinking something like the graphic LoggerHead uses on their product today (see image below) but better. And then perhaps on the front we just include copy that states 'Replaces 16 Wrenches / Replaces 14 Wrenches' or something to that effect.[7]

Incredibly, Apex went so far as to copy the Bionic Wrench invention story in their advertising.[8]

These facts also support enhancement. *Am. Med. Sys. v. Med. Eng'g Corp.*, 6 F.3d 1523, 1531 (Fed. Cir. 1993) ("[T]he district court considered the totality of the circumstances in reaching its determination that [Defendant] willfully infringed the [] patent," and found that Defendant "deliberately copied the [Plaintiff's] package design in developing its infringing … product.").

### b) Sears' And Apex's Failure to Establish a Good Faith Belief of Invalidity or Non-Infringement

During trial, Sears did not even attempt to establish a good faith belief that LoggerHead's patents are invalid or not infringed. Mr. Reese, Sears' corporate representative, admitted that the

---

[7] PTX 503; PTX 97 ("Attached are how the Bionic Wrenches are captured in their display. I feel something similar would work for our tool"); PTX 356 ("Attached are the images of the Bionic Wrench packaging per your request on this morning's Innovation Call."); PTX 505 (similar); Lowe Tr. 215:19-216:9, 217:25-218:6, 219:4-16; Li Tr. 155:12-156:5, 161:25-162:10, 162:23-163:2, 163:12-163:20, 163:25-164:7.

[8] Compare PTX 150 ("'Changing a lawnmower blade might be a good show for this tool – a standard adjustable is more prone to round that fastener because it gets worn from being under the mower. This product will better grab that fastener.") with Tr. 289:16-291:4 ("I gave [my son] the job to change over the lawnmower … I thought, you know, there was a user expressing their need in the most basic way. He wanted a tool that gripped so he could really get ahold of that fastener, but he had had bad experiences with wrenches, trying to get them on fasteners that didn't fit or couldn't engage well"; Lowe Tr. 236:22-239:12.

only thing he could confirm Sears did to investigate any infringement of LoggerHead patents was "received an e-mail from Apex stating that they had designed around the Brown patent."[9] Mr. Reese also admitted that Apex is indemnifying Sears for infringement of LoggerHead's patents. (Reese Tr. 52:5-14.) Sears presented no evidence or explanation of what steps it took to avoid infringement other than reliance on Apex, and no Sears witness testified they had even reviewed LoggerHead's patents. Mr. Broadaway testified—consistent with Mr. Reese's admissions—that Apex's conclusory representation that it had designed around the patent was sufficient to satisfy Sears, "that, together with indemnification anyway." (Tr. 1523:11-1524:13.)

Sears' lack of meaningful investigation into whether the MALW infringed—and its naked reliance on Apex's representation and indemnification not only fails to show good faith—it establishes Sears' egregious lack of respect for LoggerHead's patents and supports the maximum enhancement for willful infringement. *See, e.g.*, *Jurgens v. CBK, Ltd.*, 80 F.3d 1566, 1571 (Fed. Cir. 1996) (failure to investigate and determine in good faith a reasonable belief of invalidity or non-infringement is bad faith infringement; treble damages affirmed); *Jurgens v. McKasy*, 927 F.2d 1552, 1562 (Fed. Cir. 1991) (relying on supplier's assertion of non-infringement and indemnity is evidence of willfulness; affirming enhanced damages); *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 198 F. Supp. 3d 1343, 1351 (S.D. Fla. 2016) ("no BRP employee even took the time to review" the claims of the patent; awarding treble damages); *C&C Jewelry Mfg. v. West*, 2011 U.S. Dist. LEXIS 63688, *5 (N.D. Cal. June 13, 2011) ("evidence of indemnification against the deterrent effects that the patent laws would have on would-be infringers can be relevant to show … that infringing activities were undertaken willfully"); *Saint-Gobain Autover USA, Inc. v. Xinyi*

---

[9] Reese Tr. 31:21-32:2; *see also* 35:2-11, 36:20-37:9, 38:12-17, 40:11-41:8, 45:2-45:11, 51:16-20. 59:12-60:3, 60:18-23, 65:4-20, 66:2-3, 81:15-21, 82:4. In addition, Mr. Pope, a former Sears employee, admitted "my job is to make sure that we are not infringing any patents, and buy that I don't personally look at that" and instead he relied on non-legally trained Apex and Sears' engineers but does not know what they did or how they came to their conclusions. *See* Pope Tr. 59:5-60:9, 121:19-122:24.

*Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 750 (N.D. Ohio 2010) ("superficial investigation could not have led to a good faith belief regarding its defenses to a claim of infringement … cavalier manner in which [Defendant] treated its potential liability for infringing…clearly weighs in favor of a finding of enhancement."); *Cohesive Techs., Inc. v. Waters Corp.*, 526 F. Supp. 2d 84, 103-104 (D. Mass. 2007) (*rev'd on other grounds*, 543 F.3d 1351 (Fed. Cir. 2008)) ("In determining whether infringement was willful, a court should consider... whether the infringer was indemnified against infringement costs.").

Apex asserted an advice of counsel defense in an attempt to establish it made a good faith effort to avoid infringement. But after the jury heard all of the evidence it necessarily rejected Apex's advice of counsel defense and determined it was a willful infringer. In light of the jury's verdict, the Federal Circuit has held that a district court does not have discretion to disregard this finding or make contrary findings in deciding whether to increase damages:

> In returning its verdict of willfulness, the jury necessarily decided that CBK had acted in bad faith, thus rejecting its defenses to willful infringement. Because the jury had rejected CBK's assertion that it acted in good faith as a matter of fact, the court did not have discretion to reweigh the evidence about the competency of the opinion or CBK's reliance on it. Although a trial court many times has discretion to weigh the closeness of the case and the scope of the infringer's investigation in deciding whether to increase a damages award, it does not have discretion to reweigh this evidence once the matter has been decided by the jury and the court finds evidence sufficient to support the jury determination.

*Jurgens*, 80 F.3d at 1571 (finding district court abused its discretion to not enhance damages based on opinion of counsel and remanding with instructions that its discretionary enhancement decision may not be based on "conduct or actions that the jury has expressly rejected as factual matter"); *see also nCUBE Corp. v. SeaChange Int'l, Inc*., 313 F. Supp. 2d 361, 388 (D. Del. 2004) (after considering thirty-two page non-infringement opinion letter, "the Court finds that the jury's finding of willfulness is supported by substantial evidence and declines to reconsider this finding in the context of [an enhanced] damages evaluation.").

The evidence at trial established that Apex's advice of counsel defense failed to establish a good faith belief in non-infringement. While an opinion of counsel "is evidence to be weighed towards a determination of good faith, it is not dispositive. It is necessary to look at the totality of the circumstances presented in the case." *Cent. Soya Co. v. Geo. A. Hormel & Co.*, 723 F.2d 1573, 1576-77 (Fed. Cir. 1983). Rather than show good faith, Apex "knew or should have known that it proceeded without the type of competent legal advice upon which it could justifiably have relied." *Underwater Devices, Inc. v. Morrison-Knudsen Co.*, 717 F.2d 1380, 1390 (Fed. Cir. 1983).

The evidence at trial established that Mr. Owen's initial advice to Apex was that "the claims appear to be fairly *broadly* written, which is not a good sign… If the claims are broadly written, and there are numerous claims (here, there are at least 9+2+1 = 12 independent claims), finding a workable non-infringement path is usually a challenge." (DTX 3.) Despite that admission, Mr. Owen issued only one substantive opinion letter (DTX 6)—and that letter did not analyze each independent claim in any detail—and did not analyze *any* of the dependent claims. The letter did not make any effort to construe a single claim, and did not set forth a standard for one of ordinary skill in the art. An analysis of the dependent claims directed to a "U-shaped" gripping element would have immediately revealed that the independent claims are not limited only to those that are U-shaped, yet Mr. Owen's analysis and advice presumed that every single claim in the two asserted patents required U-shaped gripping elements—despite having previously opined that the claims are broadly written. (*Compare* DTX 3 *with* DTX 6.) Apex knew or should have known that such superficial analysis of the 67 claims in the two asserted patents was not competent or reliable. *See, e.g.*, *Bott v. Four Star Corp.*, 807 F.2d 1567, 1572 (Fed. Cir. 1986) (rejecting advice of counsel as evidence of good faith where opinion "consisted merely of conclusory statements without supporting reasons…[and] did not constitute authoritative opinions upon which a good faith reliance of invalidity may be founded."); *Ven-Tel, Inc. v. Hayes*

*Microcomputer Prods.*, 982 F.2d 1527, 1543-44 (Fed. Cir. 1992) (rejecting counsel's opinion as evidence of good faith where "the letter treated the claims of the [] patent superficially, failed to set out a standard for one of ordinary skill in the art…, mischaracterized the prior art…makes broad and conclusory statements with little, if any, support."); *Jurgens*, 80 F.3d at 1572-73 ("If infringers cold rely on any opinion to defeat willful infringement, no matter how incompetent, insulation from increased damages would be complete").

The jury also heard evidence that Apex knew that Mr. Owen spent far less time analyzing the patents than he projected would be required—and far less time than would be reasonable to conduct an authoritative non-infringement analysis of 67 claims. (*Compare* DTX 3 and Tr. 1569:8-1571:12 *with* PTXs 312, 313 and Tr. 1587:6-1590:16.) Indeed, the jury spent more time hearing the evidence during trial than Mr. Owen spent analyzing non-infringement. (*Compare* Complete Trial Transcript *with* PTXs 312, 313.) *See, e.g.*, *Johns Hopkins Univ. v. Cellpro*, 152 F.3d 1342, 1363-64 (Fed. Cir. 1998) (affirming treble damages over advice of counsel defense, "especially considering that the opinions did not express an opinion concerning infringement of the broadest claims."); *SEB S.A. v. Montgomery Ward & Co.*, 2007 U.S. Dist. LEXIS 80394, at *12-13 (S.D.N.Y. Oct. 9, 2007) (finding no good faith where plaintiff "presented evidence to impeach the quality and credibility of the [opinion] letter," and "the claim constructions used…did not comport with the claim construction by this Court," evidence that attorney "possibly gave an opinion that [defendant] wanted to hear," and also evidence that defendant "finalized the plans…prior to obtaining the opinion letter."); *Johnson & Johnston Assocs. v. R.E. Serv. Co.*, No. C 97-04382 CRB, 1998 U.S. Dist. LEXIS 20235, at *22-26 (N.D. Cal. Dec. 23, 1998) ("Opinions of counsel that are not thorough, that do not discuss pertinent facts or law, or that evidence that the attorney did not understand pertinent facts are all deemed incompetent and do not provide a shield to enhanced damages.") (citing *Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 944 (Fed. Cir. 1992)).

In addition, Mr. Owen's opinion letter repeatedly advised that his analysis was preliminary and that a more complete analysis on the final product was needed—and it also stressed the importance of his assumption and advice that Apex's proposed product is almost exactly like the Buchanan prior art device. (DTX 6, "My understanding is that proposed product would be exactly like the Buchanan tool [with a few minor exceptions]" and "the proposed design, in the relevant aspects, is identical to the Buchanan device.".) But the evidence at trial established that the MALW that Apex sold looked nothing like the original design drawing to which the DTX 6 opinion was directed—and the evidence also established that Mr. Owen never provided Apex with the more complete analysis of the final product he advised was necessary.[10] *Cargill, Inc. v. Sears Petroleum & Transp. Corp.*, 388 F. Supp. 2d 37, 75 (N.D.N.Y. 2005) ("Among the circumstances suggestive of willfulness was the extremely limited nature of the attorney opinion sought by Cargill to insulate its infringing conduct"). Further, the evidence revealed that Apex did not show Mr. Owen a Bionic Wrench, and he could not recall whether he was told that LoggerHead's patent covered a product that Apex intended to replace with its product. (Tr. 1038:10-18; 1057:11-17.) *SEB*, 2007 U.S. Dist. LEXIS at *30 (S.D.N.Y. Oct. 9, 2007) ("evidence in the record indicates that [defendant] knew that it had copied [patented product], but never told this to its attorney").

It was not reasonable for Apex to rely on this superficial analysis—even Apex engineers were skeptical that Mr. Owen had provided an accurate and analysis of non-infringement.[11] *See, e.g.*, *Stryker Corp. v. Davol Inc.*, 234 F.3d 1252, 1259 (Fed. Cir. 2000) (affirming no good faith

---

[10] *See* Tr. 1575:14-1587:5, PTX 157, PTX 320, PTX 164, PTX 319. To the extent Apex relies on any references to oral opinions from Mr. Owen, "oral opinions are not favored…because they have to be proved perhaps years after the event, based only on testimony which may be affected by faded memories and the forces of contemporaneous litigation." *3M v. Johnson & Johnson Orthopaedics, Inc.*, 976 F.2d 1559, 1580 (Fed. Cir. 1992).

[11] *See, e.g.*, PTX 160, Apex's Fu Zhihong (I doubt if we can just copy Buchanan's patent, since it very similar as Brown's, just different on jaws number. My understanding is since Buchanan's patent was expired, so Brown's patent could be applied. If we use Buchanan's, we may still infringe Brown's. I may be wrong. It's very easy to copy that 1957's patent. Seems it's too easy to be true.); PTX 320, Tr. 1493:25-1499:8 ("Q. Did you think you had what you needed from Mr. Owen when you sent this email to Mr. Munn on May 18th? A. I—you know, from my recollection at that point in time, I felt like we should—I should have more.")

because "the jury reasonably could have credited the testimony that [defendant's] reliance on the opinions of counsel was not reasonable, that it did not in fact follow those opinions, and that the designs for the accused devices were finalized before obtaining an opinion of counsel." *Cent. Soya*, 723 F.2d at 1577 ("[defendant] had not only to show an opinion from competent counsel but also that it had exercised reasonable and good faith adherence to the analysis and advice therein"); *Datascope Corp. v. SMEC, Inc*., 879 F.2d 820, 828 (Fed. Cir. 1989) (reversing no willfulness because "Our review of the record convinces us that the district court seriously underestimated Schiff's skepticism regarding the advice of counsel and similarly underestimated the court's own findings about the market pressure and urgency faced by SMEC.").

Finally, Apex never received an authoritative non-infringement analysis of the final design, and Apex's President and General Counsel made the decision to go forward with MALW sales to Sears knowing they did not have a final opinion letter, but they chose to go forward anyway because the profit opportunity was too big to wait for a final clearance letter. (*See* Tr. 1499:23-1510:18, PTX 173, PTX 127, PTX 161.) *SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1464-65 (Fed. Cir. 1997) (affirming that advice of counsel did not show good faith and enhancing damages, "The law of willful infringement does not search for minimally tolerable behavior, but requires prudent, and ethical, legal and commercial actions… totality of the circumstances may include… commercial factors that may have affected the infringer's actions.") And even though Apex chose to confirm MALW shipments to Sears without final patent clearance, Apex's General Counsel instructed Mr. Broadaway to get formal opinion letter on the final design because Apex knew that having copied the patented Bionic Wrench there was a real risk of infringement:

> If we think there is a good chance that we may be defending a patent infringement claim, and if the volumes may be high enough to indicate some real monetary risk, it is not a bad idea to invest the additional money to get a formal opinion letter from outside counsel

stating that the final design does not infringe. It provided strong insurance against a claim of willful infringement, which can escalate damages 3x. It sounds like there may be some risk here given Loggerhead's position.

PTX 161, Tr. 1506:9-1508:7. This is more than substantial evidence of willful infringement—it is compelling evidence of willful infringement and bad faith. *Ven-Tel*, 982 F.2d at 1544 ("The evidence shows that the advice of counsel was more of a protective device than a genuine effort to determine before infringing whether the patent is invalid."); *Jurgens*, 80 F.3d at 1571 (bad faith found where infringer obtains "conclusory opinions of counsel only to use as a shield against a later charge of willful infringement…attorney was not only wrong…the opinion contained only a conclusory analysis of literal infringement").

### c) Sears' And Apex's Litigation Behavior

Although litigation misconduct need not be shown for enhanced damages (*Jurgens*, 80 F.3d at 1570-71), the evidence of Defendants' misconduct here during more than four years of litigation further supports the maximum enhancement. For example, Defendants' initial invalidity contentions identified 139 references and 950 pages of claims charts asserting anticipation and obviousness to which LoggerHead had to respond. The invalidity contentions were supplemented once before service of final invalidity contentions, citing 27 references, to which LoggerHead again had to respond (the response was 850+ pages). Defendants' 35 U.S.C. § 282 Notice dated April 3, 2017 contained 17 patents that Defendants "may rely to anticipate, render obvious, and/or show the state of the art." However, at trial, only the Buchanan reference was raised—a reference cited on the face of the asserted patents. Further, the jury instructions identified five references, four of which were not presented at trial. (Dkt. 449 at p. 35.) Likewise, the jury instructions and verdict form contained instructions for obviousness, even though Defendants never presented obviousness combinations to the jury, nor could they because Dr. Fronczak admitted that he never conducted an obviousness analysis. (Dkt. 449 at 37-39; Trial Tr. at 1222:13-16, 1223:1-4).

Defendants' excessive prior art references were overbroad and designed to drive up the costs of litigation, especially considering only one reference of the original 139 was used at trial. The final invalidity contentions also asserted theories of lack of description and enablement that were not pursued at trial. Furthermore, Defendants' consistent threat to try obviousness, as evidenced by the jury instruction, without a supporting expert opinion was not in good faith and intended to complicate the proceedings and obfuscate these issues in dispute. *See, e.g.*, *SRI Int'l, Inc. v. Cisco Sys.*, No. 13-1534-SLR, 2017 U.S. Dist. LEXIS 83832, at *95 (D. Del. May 25, 2017) (finding litigation misconduct supported enhanced damages because defendant "maintained its reliance on nineteen invalidity theories to the eve of trial, and then at trial presented only a single defense of anticipation[.]"); *Maxwell v. Angel-Etts of Cal.*, 2001 U.S. Dist. LEXIS 25418, at *40, 55 (C.D. Cal. July 9, 2001) (finding litigation misconduct supported enhanced damages because many defenses "were so frivolous [defendant] eventually withdrew them" and "by the time this case went to the jury, [defendant] had dropped each and every one of these defenses").

In addition, the Court unequivocally held in its *Markman* Order that "Plaintiff's differentiation of the '470 Patent from the Buchanan patent was not a clear and unmistakable prosecution disclaimer" (Dkt. 185 at 9) and that "it would be improper to read separate structure and projection limitations into the claim." (Dkt. 185 at 7 (emphasis added).) Despite this, Defendants argued in their MSJ that based on LoggerHead's exchanges with the patent office during prosecution, prosecution disclaimer requires the claimed "arm portion" and "body portion" to be separate structures. (Dkt. 281 at 4-7, 12.) Dr. Fronczak also opined in support of Defendants' MSJ that the MALW does not contain "anything that a person of skill in the art would readily recognize as being separate 'portions.'" (Dkt. 282, Ex. 7 ¶¶ 72-79, 118-26.) LoggerHead's MIL No. 7 requested preclusion of evidence or argument contrary to the Markman Order (Dkt. 185), and Order Denying Defendants' Motion for Summary Judgment on Noninfringement and

Invalidity (Dkt. 369). In D.I. 419, the Court granted LoggerHead's motion: "The court will otherwise adhere to Judge Darrah's rulings, and will sustain objections to evidence or argument that is inconsistent with those rulings." Despite these rulings, during trial Defendants repeatedly tried to make this foreclosed argument.[12] *See, e.g.*, *Saint-Gobain Autover USA, Inc. v. Xinyi Glass N. Am., Inc.*, 707 F. Supp. 2d 737, 752-53 (N.D. Ohio 2010) (holding *Read* factor three supports enhancement because defendant "pursued a strategy of giving superficial recognition to the Court's claim construction rulings, while continuing to press its own interpretation of the claims" and finding that the "failure to afford deference to a trial court's rulings constituted further evidence of litigation misconduct"); *SRI Int'l, Inc.*, 2007 U.S. Dist. Lexis at *95 n. 55 (finding litigation misconduct based on "[r]earguing claim construction"); *Kellogg v. Nike, Inc.*, No. 8:07CV70, 2009 U.S. Dist. LEXIS 90432, at *37 (D. Neb. Sep. 30, 2009) (same).[13]

### d) Sears' and Apex's Size and Financial Condition

The fourth *Read* factor is "defendant's size and financial condition." 970 F.2d at 827. Both Defendants are large companies that sell hundreds or even thousands of tool products, while LoggerHead is a small company that sells only a few. This factor strongly favors LoggerHead. *See St. Regis*, 410 F. Supp. at 1309 (trebled damages justified "if defendant were the giant and the

---

[12] Tr. 264:25-267:20, 270:13-271:4 (Opening statement), Tr. 451:16-453:15 (with Mr. Brown – court sustained objection), Tr. 554:5-547:8 (with Dr. Cagan – court sustained objection), Tr. 1005:17-1006:9 (with Mr. Broadaway – court sustained objection), Tr. 1061:13-1064:5 (with Mr. Owen), Tr. 1098:1-1101:10, 1112:20-1113:14, 1128:18-1130:8, 1235:15-1237:15 (with Professor Fronczak), Tr. 1279:22-1293:20 (with Dr. Cagan)

[13] Two more: **(1)** after receiving Defendants' rebuttal expert report on damages, LoggerHead was forced to file a motion to exclude Defendants' reliance on financial data cited in the report that Sears failed to produce in discovery despite being responsive to LoggerHead's discovery requests. (Dkt. 249.) The Court found Sears' excuses unpersuasive and granted LoggerHead's motion to exclude these documents from "use in summary judgment or at trial and striking all references to and reliance on those documents in the Rebuttal Expert Report of Louis G. Dudney." (Dkt. 359.) **(2)** Sears' MIL No. 7 sought to preclude evidence that Sears reduced its forecast for purchasing Bionic Wrench units in mid-2012 when negotiations between Sears and LoggerHead "broke down" because "they have no bearing whatsoever on the patent questions that the jury will decide at trial." (Dkt. 404 at 12.) LoggerHead agreed. (*Id.* at 116:5-7.) However, on the first day of trial during the opening statement, *Defendants* presented argument and evidence about the very negotiations they sought to preclude. (*See, e.g.*, Tr. 254:6-18, 255:14-256:5-262.) As trial proceeded, Defendants continued to present evidence about the negotiations to attempt to cast LoggerHead as a bad actor. *See, e.g.*, Whitney Dep. Tr. 35:15-36.

plaintiff the small independent"). Because "enhanced damages are meant at least partly as a deterrent, they are especially appropriate in situations like this when a Goliath like [infringer] tries to crush, through willful infringement . . . a David like [patent owner]." *Auto. Prods. v. Tilton Eng'g, Inc.*, 1993 U.S. Dist. LEXIS 20813, at *26-28 (C.D. Cal. Sep. 16, 1993) (trebling).

Sears is a major national retailer. Tr. at 342:10-14 (Brown Dir.). A single buyer in one department at Sears (hand tools) interacted with over 100 vendors at a single point in time. Tr. at 699:15-22 (Kaleta Dir.). In its May 25, 2017 press release announcing first quarter 2017 earnings, Sears "reported net income attributable to Holdings' shareholders of $244 million."[14] The same press release confirms that Sears' "total cash balances were $264 million at April 29, 2017" and that the company "had total liquidity and liquid assets of $3.7 billion at April 29, 2017." *Id.*

Similarly, Apex is a large global company that makes power tools and hand tools. Tr. at 894:19-20, 895:5-. Apex has "7,000 employees around the world[.]" Tr. at 899:8-10. Apex owns at least seven tool brands, and it sells over a thousand different types of hand tools under the Crescent brand alone. Tr. at 899:20-901:7. "There are over 20,000 different kind of part numbers or items that [Apex is] actively selling every year." Tr. at 901:5-7. Apex is "wholly owned by one of the world's leading private equity firms, Bain Capital."[15] Apex's website notes that its annual revenues are $1.4 Billion.[16] Apex is financially healthy enough that it agreed to indemnify Sears for any finding of liability for infringement. Reese Dep. Tr. 52:5-14; *see Dominion Res. Inc. v. Alstom Grid, Inc.*, No. 15-224, 2016 U.S. Dist. LEXIS 136728, at *64-65 (E.D. Pa. Oct. 3, 2016) (enhancing damages where one co-infringer offered the other "unlimited indemnity for any litigation related to [the asserted patents].").

---

[14] *See* http://searsholdings.com/press-releases/pr/2043 (last visited on June 22, 2017).
[15] *See* http://www.apextoolgroup.com/faq?action (last visited June 22, 2017).
[16] *See* http://www.apextoolgroup.com/about-us (last visited June 22, 2017).

There is no evidence in the record that either Sears or Apex's "operations or business would be severely jeopardized by an award of enhanced damages." *Id.; see also Omega Patents, LLC v. CalAmp Corp.*, No. 6:13-cv-1950-Orl-40DCI, 2017 U.S. Dist. LEXIS 55846, at *23-26 (M.D. Fla. Apr. 6, 2017) (awarding treble damages where defendant "has the financial wherewithal to endure the sanction of enhanced damages"). In this context, "[t]he overall financial health of the infringer is evaluated—not the net profit generated by the offending conduct…" *Powell v. Home Depot U.S.A., Inc.*, 715 F. Supp. 2d 1285, 1298 (S.D. Fla. May 28, 2010); *see also Georgetown Rail Equip. Co.*, 2016 U.S. Dist. LEXIS at *59-60 ("a trebled award would [not] unduly prejudice [defendant's] non-infringing business").

In contrast, LoggerHead is a small company that inventor Dan Brown Sr. started in 2005 in order to bring his patented Bionic Wrench to the marketplace. Tr. at 329:25-330:19, 287:23-288:10 (Brown Dir.). Mr. Brown testified that he used his savings and cashed out his retirement as well as re-mortgaged his house to fund the company. Tr. at 287:23-288:10 (Brown Dir.). LoggerHead's flagship product is the Bionic Wrench, and it only sells four other products, and three of them are based on the same design as the Bionic Wrench. Tr. at 288:14-22 (Brown Dir.).

In addition, the fact that Mr. Brown and LoggerHead had to litigate against corporate giants Sears and Apex for almost five years means this factor favors enhancement. Tr. at 373:10-11; *see Maxwell*, 2001 U.S. Dist. LEXIS. at *41-42 (finding this factor weighed in favor of "an individual who has had to fight for her rights for over 10 years…[and] litigate against the behemoths of the discount shoe industry").

### e)  Closeness of the Case

This was not a close case. The jury returned a verdict in a few hours in the liability phase, finding for LoggerHead on every issue—and returned a verdict finding both defendants' infringement willful in an even shorter time. Defendants' invalidity defense bordered on

frivolous—it was advanced only in the alternative in the event the jury found infringement. In *Zenith Elecs. Corp. v. PDI Commun. Sys.*, 522 F.3d 1348, 1363-1364 (Fed. Cir. 2008), the Federal Circuit explicitly rejected Defendants' improper "if infringement, then invalidity" construct:

> Regardless of whether [accused infringer's] statement [that it is practicing the prior] is correct, anticipation cannot be proved by merely establishing that one 'practices the prior art' …mere proof that the prior art is identical, in all material respects, to an allegedly infringing product cannot constitute clear and convincing evidence of invalidity. Anticipation requires a showing that each element of the claim at issue, properly construed, is found in a single prior art reference.

Defendants' non-infringement defense was essentially foreclosed by the Court's *Markman* Order. Defendants did not even bother to put on a damages defense. These facts support enhancement. *See, e.g.*, *Georgetown Rail Equip. Co.*, 2016 U.S. Dist. LEXIS at *60-61 ("Defendant's noninfringement defenses were not strong. This is not surprising given the fact that [patentee's product] is the commercial embodiment of claim 16 and considering its similarity to [the accused system]…this was not a close case and given the reasonable relief [patentee requested, it could have been resolved in a more efficient manner. Accordingly, this factor favors enhancement.").

### f) Sears' and Apex's Duration of Misconduct

Apex first offered to sell the MALW to Sears in May of 2012, and Sears first imported the Max Axess in August of 2012. (PTX 172; DTX 130.) For the past five years, despite the filing of this suit in November of 2012, Apex has continued to sell and offer to sell the MALW to Sears, and Sears has continued to import and to sell the MALW to consumers. (*See, e.g.*, PTX 494; DTX 130; Tr. 588:17-589:11; D.I. 1.) Courts have consistently held that Defendants' 5 years of infringement, which continued after LoggerHead filed its suit, weights in favor of enhanced damages. *See, e.g., Broadcom Corp. v. Qualcomm, Inc.,* No. SACV 05-467-JVS, 2007 U.S. Dist. LEXIS 99068 (C.D. Cal. 2007) ("The length of [defendant's] infringement (approximately two years), coupled with the fact that infringement continued after [plaintiff] filed its suit, supports an

increase in damages."); *Finjan Software, Ltd. v. Secure Computing Corp.*, 2009 U.S. Dist. LEXIS 72825, at *51 (D. Del. Aug. 18, 2009) ("[Defendant] does not dispute that its [infringing] product has been for sale for more than four years, or that it has continued to sell the product since this lawsuit began. Thus, this factor weighs in favor of enhanced damages."); *Polara Eng'g, Inc. v. Campbell Co.*, 2017 U.S. Dist. LEXIS 27304, at *77 (C.D. Cal. Feb. 27, 2017) ("[Plaintiff] argues that the duration of [Defendant's] infringement weighs in favor of enhancement. The Court agrees. [Defendant's] infringement began more than six years ago. Courts have concluded that similarly lengthy periods of infringement weigh in favor of enhancement. *See, e.g., I-Flow Corp. v. Apex Med. Techs., Inc.*, 2010 U.S. Dist. LEXIS 1021 (S.D. Cal. Jan. 6, 2010) (finding six years of misconduct was 'substantial,' favoring enhancement).").

### g) The Infringers' Remedial Actions

Courts have consistently held that this factor weights in favor of enhanced damages where, as here, Defendants have "not taken any remedial action to remove its infringing product from the marketplace or alter it to cease the infringement since the complaint was filed in [November] 2012, despite a jury verdict finding willful infringement." *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 85-86 (D. Mass. 2015); *Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 280 (D. Del. 2012), *aff'd*, 497 F. App'x 69 (Fed. Cir. 2013) (favoring enhancement where "there is no indication that [Defendant] recalled any product or stopped any shipments of infringing product prior to the January 1, 2012 end production date. Thus, [Defendant] continues to sell out its infringing product despite the judgment against it. [Defendant] has simply made the business decision that it will not be profitable for it to sell infringing stents moving forward."); *Finjan Software, Ltd. v. Secure Computing Corp.*, 2009 U.S. Dist. LEXIS 72825, at *51 (D. Del. Aug. 18, 2009) ("[Defendant] has continued to manufacture and sell its accused … products in the

marketplace, despite the pendency of this litigation. The court, therefore, finds that this factor weighs in favor of enhanced damages."). (*See* PTX 494; DTX 130; Tr. 588:17-589:11; D.I. 1.).

Moreover, despite over a month having passed since the jury found that both Defendants had willfully infringed LoggerHead's patents, neither Defendant has indicated to LoggerHead that it has or even intends to stop selling the MALW. As in *Veracode*, where Defendants similarly "chose[] to await a final order from this court entering judgment or imposing an injunction," this additionally weighs in favor of enhanced damages. *Id.*

### h) The Infringers' Motivation for Harm

An infringer's "motivation for harm" is also a *Read* factor, which "typically favors enhanced damages when the patentee is a direct competitor of the infringer and the infringement is used and designed to harm the competition." *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2014 U.S. Dist. LEXIS 43042, at *70 (W.D. Pa. Mar. 31, 2014) (citing *Odetics, Inc. v. Storage Tech. Corp.*, 14 F. Supp. 2d 800, 804 (E.D. Va. 1998) *aff'd*, 185 F.3d 1259 (Fed. Cir. 1999); *Parker-Hannifin Corp. v. Wix Filtration Corp.*, 2011 U.S. Dist. LEXIS 33578 (N.D. Oh. Mar. 17, 2011) (noting that patentee and infringer were fierce competitors and each were vying for GM's business); *K-TEC v. Vita-Mix*, 765 F. Supp. 2d 1304 (D. Utah 2011) (patentee and infringer were direct competitors and infringer was seeking to prevent customers from purchasing products from patentee).

There is no dispute that LoggerHead and Defendants Sears and Apex "are head-to-head competitors in the same market." (Tr. 613:23-614:7, 587:19-588:16, 589:19-590:14; 590:21-592:7 664:21-665:3; PTX 154.) In fact, once Sears learned it would receive the MALW from Apex in time for 2012 fourth quarter sales, Sears dropped its fourth quarter forecast of Bionic Wrenches from 213,000 to 2,971 units. (PTX 376; Tr. 359:4-20, 360:8-11, 362:9-20.) Similarly, once Sears added the MALW to its inventory, Sears internal documents revealed that it "downtrended the

Bionic forecast … to account for cannibalization," by which it meant that the MALW "was going to cannibalize or eat sales of the Bionic Wrench." (Tr. 855:24-856:11; PTX 425.) Prior to the MALW, LoggerHead had a monopoly on the patented technology, and this factor weighs in favor of enhanced damages. *See, e.g.*, *Veracode, Inc. v. Appthority, Inc.*, 137 F. Supp. 3d 17, 86 (D. Mass. 2015) ("where parties are in direct competition with one another, I recognize the inference can be made of a motivation to harm by offering an infringing product where the patentee holds an effective monopoly on the patented technology."); *Polara Eng'g, Inc. v. Campbell Co.*, No. SA CV 13-00007-DFM, 2017 U.S. Dist. LEXIS 27304, at *78 (C.D. Cal. Feb. 27, 2017) ("It is undisputed that [the parties] are direct competitors in a relatively small market for APS systems; infringement by a direct competitor in such a market mitigates in favor of enhanced damages.").

The inference that Defendants infringed with a motivation to harm LoggerHead is strengthened by the fact that LoggerHead's Bionic Wrench and Defendants' MALW are "the only two products … of this type"; it is "a two-party market." (Tr. 613:23-614:7, 664:21-665:3, 587:19-588:16, 589:19-590:14, 590:21-592:7; PTX 154.) *TruePosition Inc. v. Andrew Corp.*, 568 F. Supp. 2d 500, 529 (D. Del. 2008) ("[I]nfringement by [a] direct competitor in a highly competitive two-supplier industry mitigates in favor of enhanced damages").

"[T]he evidence of motivation to harm becomes greater when the patentee and infringer are in direct competition, and the accused infringer's actions are specifically intended to take business away from the patent owner." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 762 F. Supp. 2d 710, 724 (D. Del. 2011) ("[W]here, as here, the infringer engages in infringing conduct to gain an edge over the patentee in a competitive market, this factor favors an award of enhanced damages."). Sears admitted at trial that it ordered Apex to design the MALW so Sears "could win some business from" the Bionic Wrench. (Pope Tr. 43:9-11, 46:24-47:4; Arvia Tr. 147:16-18, 147:21-24.) In particular, Sears communicated to Apex that one requirement

for the MALW was that "at Craftsman, [the wrench] can't be worse than the competition that you're going after." (Pope Tr. 86:17-24.)

Apex has also admitted that the MALW was being designed to take business away from the Bionic Wrench. (PTX 128 ("So that means either LoggerHead goes away entirely or gets their volume very much reduced."); PTX 495 (Apex email to Sears re: "Bionic replacement"); Tr. 975:15-978:6 ("the Max Axess was indeed a Bionic replacement"); Li Tr. 70:18-71:20, 71:23-71:25 ("bionic replacement means Craftsman version with Craftsman advantage as a competitive product" to the "Loggerhead Bionic wrench").) In fact, once Sears told Apex LoggerHead's price to Sears, Apex used this information to lower its price and win Sears's MALW business away from LoggerHead's Bionic Wrench. (Tr. 849:4-851:16; PTX 371; PTX 352.) *See Georgetown Rail Equip. Co. v. Holland L.P.*, No. 6:13-CV-366, 2016 U.S. Dist. LEXIS 78365, at *39-44 (E.D. Tex. June 16, 2016) (awarding enhanced damages under where Defendant used knowledge of Plaintiff's pricing to win a bid from Plaintiff's customer to sell the infringing technology). Sears's and Apex's intentions to take business away from LoggerHead by selling the infringing MALW therefore weigh in favor of enhancement. *Bos. Sci. Corp. v. Cordis Corp.*, 838 F. Supp. 2d 259, 280 (D. Del. 2012) ("Factor 8 also favors enhanced damages, as the facts permit an inference of [Defendant's] motivation to harm [Plaintiff]. [Defendant] saw a market opportunity in offering the [infringing product]" where Plaintiff "had a monopoly" on the market until Defendant's launch).

Moreover, Sears's conduct during LoggerHead's contract negotiations further weighs in favor of enhancement. Specifically, Sears's delay tactics and extension of its contract negotiations with LoggerHead until Sears was certain that Apex would be able to supply the MALW to Sears for the 2012 holiday season—at which point Sears dropped its negotiations and its forecasted orders with LoggerHead—is the type of failure to "exercise[] the due care owed to a patent holder" that courts have held warrants enhanced damages. *See SRI Int'l, Inc. v. Advanced Tech.*

*Labs., Inc.*, 127 F.3d 1462, 1468 (Fed. Cir. 1997) (affirming treble damages where Defendant "deliberately prolonged its dealings with [Plaintiff], imposing delay after delay, in order to fend off [Plaintiff] as long as possible and allow its profitable infringement of the patent to continue.' … Commercial conduct may be relevant in determining whether the infringer exercised the due care owed to a patent holder.").[17]

Far from showing "due care owed to a patent holder," Apex admitted that it proceeded with copying the Bionic Wrench and selling the MALW, knowing full well that this would likely evoke a response from LoggerHead, Brown Patent 6,889,579, because the product is so close to their Bionic Wrench TM." (PTX 159; Tr. 1494:19-1495:7.) And Sears admitted that its motivation to knock-off the Bionic Wrench was too fight for every dollar of margin. (Tr. (Kaleta) 870:11-15.) This, too, weighs in favor of enhancement. *Maxwell*, 2001 U.S. Dist. LEXIS, at *70 (finding that the "evidence provides an ample basis to conclude that [Defendant's] motivations were greed and disrespect for the rights of [Plaintiff] as an individual with very limited resources…[Defendant] knew that forcing [Plaintiff] to sue and try this case would strain [Plaintiff's] resources and potentially let [Defendant] off the hook without ever having to pay for its [wrongdoing].").

### i) The Infringers' Attempt to Conceal Misconduct

In evaluating this factor, courts look whether the infringer attempted to conceal evidence of misconduct. *See e.g., Minks v. Polaris Industries, Inc.*, No. 6:05-cv-1894-Orl-31KRS, 2007 U.S. Dist. LEXIS 17862, 2007 WL 788418, at *1 (M.D. Fl. Mar. 14, 2007); This factor supports

---

[17] *See, e.g.,* Tr. 354:12-357:18, 359:15-360:11, 362:9-20; 832:18-833:15 ("Q: Now, at this same time period when you're working on agreements with LoggerHead, you're also – in the February and March time period is the first time when Sears started working with Apex to develop the Max Axess wrench, right? A: Yes, it's around this time."); Tr. 835:4-20, 836:20-837:5, 838:24-840:7, 841:17-844:14 ("Q: And there was no time where you were telling LoggerHead about your – what your communications were with working on the Max Axess replacement for the Bionic Wrench, right? A: Correct. A buyer would never do that."); Tr. 844:25-845:18, 854:7-855:13, 859:20-861:1, 866:16-869:6; PTX 376; DTX 180; PTX 433; PTX 405; PTX 461; PTX 369; PTX 371; PTX 352; PTX 121; PTX 427.)

enhancement, because the evidence at trial established that Sears and Apex attempted to conceal their infringement by issuing a false press release in an attempt to respond to a social media firestorm unleashed when the New York Times and ABC News ran stories covering LoggerHead's lawsuit against Sears and Apex. Sears' press release falsely states:

> We take intellectual property rights very seriously and respect those rights…Despite some visual similarities to other tools on the market, the Craftsman MALW operates in a different way, using a mechanism designed in the 1950s that Mr. Brown expressly argued to the patent office was different from his own design. (PTX 502.)

The press release includes Figures 1 and 2 of the Buchanan patent. Mr. Reese testified on behalf of Sears that despite issuing the press release, Sears does not know whether the MALW uses the Buchanan mechanism. (Reese Tr. 76:17-76:22, 77:2-7, 77:10-18, 80:23-81:7.) And as established during claim construction, and again at trial, Sears' statement about what Mr. Brown argued to the Patent Office about Buchanan is false. Sears copied the Bionic Wrench, did not copy any aspect of the Buchanan patent, and Sears' press release was designed to cover-up infringing misconduct to the public at large. This attempt to conceal supports enhanced damages. *Carnegie Mellon Univ. v. Marvell Tech. Grp., Ltd.*, Civil Action No. 09-290, 2014 U.S. Dist. LEXIS 43042, at *72 (W.D. Pa. Mar. 31, 2014).

### C. The Court Should Award Treble Damages Against Both Sears And Apex

#### 1. Enhanced Damages Must Be Assessed Separately For Each Willfully Infringing Defendant

Patent infringement is a strict liability offense, and "[w]hen multiple parties have jointly infringed a patent, each party is jointly and severally liable for all [compensatory] damages resulting from the infringement." *U.S. Philips Corp. v. Int'l Norcent Tech.*, No. 2:06-cv-01366, 2007 U.S. Dist. LEXIS 96586, at *6-7 (C.D. Cal. Oct. 16, 2007). In contrast, "enhanced damages are punitive and depend on a showing of willful infringement . . . Parties not found to willfully infringe, therefore, cannot be held jointly and severally liable for willfulness damages." *Primos,*

*Inc. v. Hunter's Specialties, Inc.*, No. C01-0004, 2004 U.S. Dist. Lexis 31226, at *58 (N.D. Iowa Spe. 7, 2004) (citing *Sensonics, Inc. v. Aerosonic Corp.*, 81 F.3d 1566, 1574 (Fed. Cir. 1996).

The facts giving rise to willful infringement and enhanced damages are personal to each infringer, "because willful infringement depends on the conduct and knowledge of the party against whom the claim is made—it is not derivative liability." *Fleming v. Escort, Inc.*, No. 1:12-cv-066, 2013 U.S. Dist. Lexis 110203, at *12 (D. Idaho Aug. 5, 2013) (citing *Seagate*, 497 F.3d 1360 (Fed Cir. 2007). For this reason, "enhanced damages may be awarded only as a penalty for an infringer's increased culpability, namely willful infringement[.]" *Beatrice Foods Co. v. New Eng. Printing & Litho. Co.*, 923 F.2d 1576, 1579 (Fed. Cir. 1991). Moreover, enhancing damages separately against both Sears and Apex does not result in a forbidden double recovery, because "an award for willful infringement is an 'enhanced' damage award that does not duplicate, or overlap with, the award for basic infringement." *Id.* (citing *Seagate* at 1368).

Based on the foregoing, Sears and Apex are jointly and severally liable for the basic (compensatory) infringement damages the jury awarded in the amount of $5,979,616. That compensatory damages award serves as "the base from which" any enhanced damages are calculated for Sears' willful infringement and for Apex's willful infringement. *Applera Corp. v. MJ Research Inc.*, No. 3:98cv1201, 2004 U.S. Dist. Lexis 7538, at *10 (D. Conn. Apr. 28, 2004) (citing *Crystal Semiconductor*, 246 F.3d at 1361. Because the maximum statutory enhancement for willful infringement is capped at three times the compensatory damages award, the maximum enhancement the Court is permitted to assess against Sears as a penalty for its willful infringement is $11,959,232; and the maximum enhancement the Court may assess against Apex as a penalty for its willful infringement is $11,959,232.[18]

---

[18] For clarity, in the event the Court enters judgment on the jury's verdict and awards the maximum enhancement for willfulness against both Sears and Apex, the damages judgment would be entered as follows: $5,979,616 jointly and

### 2. The Public Policy Rationale Behind Enhanced Damages Supports Trebling Damages Against Sears And Apex

Sears and Apex are the wanton infringers the Supreme Court sought to punish when it relaxed the standard governing willfulness and enhanced damages. *Halo*, 136 S. Ct. at 1933-34 ("Section 284 permits district courts to exercise their discretion in a manner free from the inelastic constraints of the *Seagate* test. Consistent with nearly two centuries of enhanced damages under patent law, however, such punishment should generally be reserved for egregious cases typified by willful misconduct."). Every *Read* factor favors enhancement against both Sears and Apex. The remedy of enhanced damages serves several important public interests.

*First*, increased damages serve a primary goal of punishment and deterrence. *See SRI Int'l, Inc. v. Advanced Tech. Labs., Inc.*, 127 F.3d 1462, 1468 (Fed. Cir. 1997). *Second*, enhanced damages have the "benefit of quantifying the equities as between patentee and infringer." *Id.* at 1468. *Third*, courts have recognized that enhanced damages serve the overarching goal of patent law, "to promote the Progress of Science and useful Arts, by securing . . . [to] Inventors the exclusive Right to their . . . discoveries." *See* U.S. CONST. art. I, § 8, cl. 8; *see also Century Wrecker Corp. v. E.R. Buske Mfg. Co.*, 913 F. Supp. 1256, 1291 (N.D. Iowa 1997) (noting the "importance of patent privileges and protections to fostering invention and entrepreneurship" and concluding enhanced damages "could be uniquely effective in preventing the stifling effect of infringement on the spirit of invention"). *Fourth*, "the potential for an infringing party to be liable for an amount greater than the royalties it would have paid under a negotiated license agreement, helps to encourage such agreements and to deter litigation." *Church & Dwight Co. v. Abbott Labs.*, No. 05-2142, 2008 U.S. Dist. LEXIS 49588, at *14-15 (D.N.J. June 23, 2008).

---

severally against Sears and Apex for compensatory damages, enhanced damages of $11,959,232 against Sears personally, and enhanced damages of $11,959,232 against Apex personally.

Dated: June 22, 2017

Respectfully submitted,

*/s/ Paul J. Skiermont*
Paul J. Skiermont
N.D. Ill. Bar No. 6278464
Sarah Spires
Admitted *pro hac vice*
Sadaf Abdullah
Admitted *pro hac vice*
Steven Hartsell
N.D. Ill. Bar No. 24040199
Steve Udick
Admitted *pro hac vice*
Skiermont Derby LLP
2200 Ross Avenue, Suite 4800W
Dallas, Texas 75201
(214) 978-6600 (Telephone)
(214) 978-6601 (Facsimile)
pskiermont@skiermontderby.com
sspires@skiermontderby.com
sabdullah@skiermontderby.com
shartsell@skiermontderby.com
sudick@skiermontderby.com

Philip S. Beck
Jason L. Peltz
Asha L.I. Spencer
Robert B. Tannenbaum
Jean Tinkham
Bartlit Beck Herman
Palenchar & Scott, LLP
Courthouse Place
54 West Hubbard Street, Suite 300
Chicago, Illinois 60654
(312) 494-4469 (Telephone)
(312) 494-4400 (Facsimile)
philip.beck@bartlit-beck.com
jason.peltz@bartlit-beck.com
asha.spencer@bartlit-beck.com
robert.tannenbaum@bartlit-beck.com
jean.tinkham@bartlit-beck.com
*Counsel for Plaintiff*
*LoggerHead Tools, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on June 22, 2017, the foregoing document was filed electronically through the Court's Electronic Case Filing System.  Service of this document is being made upon all counsel of record in this case by the Notice of Electronic Filing issued through the Court's Electronic Case Filing System on this date.


By: */s/ Paul J. Skiermont*